*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0232P (6th Cir.)
File Name: 01a0232p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

WILLIAM H. WALKER, JR.,
      *Plaintiff-Appellee/*
*Cross-Appellant (99-2004),*

    *v.*

THOMAS BAIN, Guard; JANICE
METZGER,
      *Defendants-Appellants*
        *(99-2001/2349)/*
      *Cross-Appellees,*

THOMAS BIRKETTE, Warden,
      *Defendant,*

UNITED STATES OF AMERICA,
      *Intervenor.*

Nos. 99-2001/
2004/2349

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 95-76273—Paul J. Komives, Magistrate Judge.

Argued: March 16, 2001

Decided and Filed: July 20, 2001

Before: KEITH, NORRIS, and DAUGHTREY, Circuit
Judges.

1

―――――――――――

**COUNSEL**

**ARGUED:** Linda M. Olivieri, OFFICE OF THE ATTORNEY GENERAL, CORRECTIONS DIVISION, Lansing, Michigan, for Appellant. Deric J. Bomar, DYKEMA GOSSETT, Detroit, Michigan, for Appellee. Daniel Kaplan, U.S. DEPARTMENT OF JUSTICE, CIVIL RIGHTS DIVISION, Washington, D.C., for Intervenor. **ON BRIEF:** Linda M. Olivieri, OFFICE OF THE ATTORNEY GENERAL, CORRECTIONS DIVISION, Lansing, Michigan, for Appellant. Deric J. Bomar, DYKEMA GOSSETT, Detroit, Michigan, for Appellee. Daniel Kaplan, John C. Hoyle, U.S. DEPARTMENT OF JUSTICE, CIVIL RIGHTS DIVISION, Washington, D.C., for Intervenor. Todd R. Marti, OFFICE OF THE ATTORNEY GENERAL, CORRECTIONS LITIGATION SECTION, Columbus, Ohio, for Amicus Curiae.

KEITH, J., delivered the opinion of the court, in which NORRIS, J., joined. DAUGHTREY, J. (pp. 23-33), delivered a separate opinion concurring in part and dissenting in part.

―――――――――――

**OPINION**

―――――――――――

DAMON J. KEITH, Circuit Judge. Plaintiff-appellee William Walker, a Michigan state prisoner, brought suit against corrections officers claiming First Amendment retaliation in violation of 42 U.S.C. § 1983. A jury returned a verdict in Walker's favor in part, setting damages of $426. Upon Walker's motion for attorney fees pursuant to 42 U.S.C. § 1988, the magistrate judge held that the attorney fee cap set forth in § 803(d)(2) of the Prison Litigation Reform Act (PLRA), codified at 42 U.S.C. § 1997e(d)(2), violated Equal Protection. The court subsequently granted in part Walker's motion for attorney fees in the amount of $34,493.72. Defendants appeal from these two orders. Walker cross-

appeals the denial of his motion for new trial. For the reasons that follow, we **REVERSE** the order ruling that § 1997e(d)(2) is unconstitutional, **VACATE** the order granting in part Walker's motion for attorney fees, **REMAND** for a redetermination of fees under the PLRA, and **AFFIRM** the denial of Walker's motion for a new trial.

## I. BACKGROUND

### A. Factual History

Walker, an inmate, serves as a "jailhouse lawyer"at Standish Maximum Correctional Facility ("Standish"). In addition to handling his own legal matters, Walker assists other Standish inmates in connection with their legal matters. Walker routinely filed grievances against correction officers, and assisted other inmates in filing and handling grievances.

On April 4, 1995, in retaliation for his filing of grievances, defendants-appellants Thomas Bain and Janice Metzger, Standish correction officers, performed a "shake down" of Walker's cell, and improperly confiscated documents and personal property. At that time, Walker was preparing for several cases, and had documents in stacks in various places in his cell.

Prior to April 4, 1995, Walker requested grievance forms from, and filed grievances against, both Bain and Metzger. Walker testified that Bain often delayed in providing him with grievance forms, and would provide only one form when he requested several. Walker reported Bain's conduct to Bain's superior officer, who ordered Bain to provide Walker with the number of grievance forms he requested.

On the date of the unlawful retaliatory incident, Metzger asked Walker if he wanted to take a shower, and he responded that he did. Subsequently, Bain came to Walker's cell and the two had a disagreement over whether Walker would be permitted to shower. When Bain indicated that Walker would not be taking a shower, Walker requested a grievance form so that he could report Bain's conduct. Bain stated that he was

tired of grievances, and he and Metzger escorted Walker to the shower.  Walker testified that Bain indicated that he would teach Walker a lesson about filing grievances.

While Walker was using the shower, Bain and Metzger searched his cell.  Bain and Metzger left Walker's cell with a large plastic bag containing documents.

Bain and Metzger escorted Walker back to his cell after his shower.  Upon his return, Walker surmised that his cell had been the subject of a "shake down."  He called for another corrections officer to view the condition of his cell, and requested that photographs and a video be taken of his cell.  Walker's request was denied, and Walker was ordered into his cell.  When he entered his cell, Walker's wrists were handcuffed behind his back, and a leather strap was attached to the handcuffs.  After the cell door had closed, Walker's hands and arms went through the food slot on the door in such a manner as to cause minor scrapes and cuts to Walker's hands and wrists.  The prison nurse treated Walker's abrasions later that evening.  Walker subsequently determined that many of his legal documents were missing.

## B.  Procedural History

On May 30, 1995, Walker filed a *pro se* complaint in the United States District Court for the Eastern District of Michigan against Bain and Metzger.  Walker asserted retaliation claims pursuant to 42 U.S.C. § 1983 against both defendants.

Walker's § 1983 claims against defendants survived a motion to dismiss and three motions for summary judgment. Walker began filing motions for appointment of counsel on September 20, 1995.  The district court finally appointed counsel on March 10, 1997, after the effective date of the PLRA.  On July 21, 1998, the district court referred the case to Magistrate Judge Paul Komives for all further proceedings and entry of judgment with the consent of the parties pursuant to 28 U.S.C. § 636(c).

turned into a "superlegislature," the true concern here is that Congress has turned itself into a "superjudiciary," invading a province not reserved to it by our Constitution, impinging upon the court's responsibility to determine appropriate attorneys' fee awards according to well-established practices, and affording disparate treatment to different groups without even a rational basis for doing so.  Consequently, I would hold that § 1997e(d)(2)'s cap on the attorney's fees to be awarded to counsel for a successful, incarcerated civil rights plaintiff violates Equal Protection guarantees by treating prisoner and non-prisoner litigants differently.  I would thus affirm the judgment of the district court and now respectfully dissent from that portion of the majority opinion that does not do so.

that *Hadix* dealt only with a challenge to the constitutionality of § 1997e(d)(3), now concludes that the same arguments that were accepted to justify (d)(3)'s cap on the *hourly rate* charged by attorneys representing prisoners in § 1983 actions hold true in this instance as well.

Without question, this court's "law of the circuit" doctrine precludes us from challenging in this appeal the efficacy of the *Hadix* decision. *See*, *e.g.*, *United States v. Seltzer*, 794 F.2d 1114, 1123 (6th Cir. 1986) (only an *en banc* court may overrule circuit precedent, absent an intervening Supreme Court decision or change in the applicable law). I believe, however, that the provisions of §§ 1997e(d)(2) and 1997e(d)(3) are radically different in their import and that the arguments supporting the rationality of one piece of the legislation do not necessarily apply in the other. As we noted in *Hadix*, Congress could rationally determine that funds in the public treasury could be saved if the calculation of fees awarded to prevailing attorneys began with a lower presumptively-proper hourly rate under § 1997e(d)(3). *See Hadix*, 230 F.3d at 845-46. The same logic does not extend to an analysis of the constitutionality of § 1997e(d)(2), however. Once the "customary fee" component of any proper attorneys' fee award under § 1988 is capped, the multi-factored analysis to be undertaken by a district court ensures that only an appropriate fee amount will be awarded. The concerns and rationales that underpinned the *Hadix* decision are thus irrelevant to a constitutional analysis of § 1997e(d)(2).

## IV.

The majority, while admitting "to being troubled by a federal statute that seeks to reduce the number of meritorious civil rights claims and protect the public fisc at the expense of denying a politically unpopular group their ability to vindicate actual . . . civil rights violations," in fact upholds such legislation through fear of turning the judiciary into a "superlegislature." I would suggest that the majority's vision in this matter has been inverted. Rather than the court being

A jury trial began on October 13, 1998, and concluded on October 20, 1998. The court submitted the case to the jury on special interrogatories, and the jury returned its answers on October 20, 1998. The court entered judgment in favor of defendants on February 26, 1999. Walker moved to amend the judgment pursuant to Fed. R. Civ. P. 59(e) on March 12, 1998, based on an intervening change of controlling law. On April 23, 1999, the court granted Walker's motion, and ordered entry of an amended judgment in favor of Walker and against defendants jointly and severally in the amount of $1.00, and in favor of Walker and against Bain and Metzger in the amounts of $300.00 and $125.00, respectively. Walker filed a motion for partial new trial on May 7, 1999. The court denied Walker's motion in an order dated August 3, 1999. Walker filed an appeal from the court's order denying his motion for a partial new trial.

On May 7, 1999, as a partially successful civil rights litigant under 42 U.S.C. § 1983, Walker filed a motion for attorney fees seeking $36,046.25 pursuant to 42 U.S.C. § 1988 and Fed. R. Civ. P. 54(d). Defendants filed a response arguing that, pursuant to § 803(d)(2) of the PLRA, Walker was entitled to a fee of only $629.00. Walker filed a reply brief arguing that the PLRA attorney fee cap was unconstitutional both on vagueness and Equal Protection grounds. In an order dated August 3, 1999, Magistrate Judge Komives held that the statute was not unconstitutionally vague, but that it did violate the Equal Protection component of the Fifth Amendment of the United States Constitution. *See Walker v. Bain*, 65 F. Supp. 2d 591, 599-605 (E.D. Mich. 1999). The court denied defendants' motion for reconsideration on August 30, 1999. *See id*. at 606-10. Defendants filed a timely appeal from the order of the court.

On October 18, 1999, the court granted Walker's motion for attorney fees in part, and ordered defendants to pay Walker's reasonable attorney fees in the amount of $34,493.72. Defendants filed a timely notice of appeal from the court's order granting in part Walker's motion for attorney

fees.    We consolidated the three appeals taken from the magistrate's final orders.

We permitted the United States to intervene pursuant to 28 U.S.C. § 2403 to defend the constitutionality of the PLRA. The Attorney General of the State of Ohio participated on appeal as *amicus curiae*, urging the constitutionality of PLRA.

## II. DISCUSSION

### A.   The PLRA Fee Cap

The PLRA contains various provisions that were intended to discourage prisoners from filing claims that are unlikely to succeed.  *See Crawford-El v. Britton*, 523 U.S. 574, 596 (1998).  Among the many new changes relating to prisoner civil rights suits, the PLRA modifies the application of 42 U.S.C. § 1988[1] to prevailing prisoners by providing stringent limitations on both the availability and the amount of attorney fee awards.  *See* 42 U.S.C. § 1997e(d).  The PLRA's attorney fee provisions are found at 42 U.S.C. § 1997e(d), which provides:

> (1) In any action brought by a prisoner who is confined to any jail, prison, or other correctional facility, in which attorney's fees are authorized under [42 U.S.C. § 1988], such fees shall not be awarded, except to the extent that--
> (A) the fee was directly and reasonably incurred in proving an actual violation of the plaintiff's rights protected by a statute pursuant to which a fee may be awarded under [42 U.S.C. § 1988]; and
> (B)(i) the amount of the fee is proportionately related to the court ordered relief for the violation; or

---

[1] Title 42 U.S.C. § 1988(b) provides that:  "[i]n any action or proceeding to enforce provisions of sections 1981, 1982, 1983, 1985, and 1986 of this title, . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorneys' fee as part of the costs."

still be required to devote time to defense of those actions. Second, because the award of attorneys' fees to other individuals has little impact on the prisoner actually initiating the suit, fee award restrictions would have no effect on the daily morale and interactions within the prison walls. Without a reasonable relationship between the statutory provision and the identified goal, the distinction drawn by the legislation between successful prisoner litigants and other successful civil rights litigants must be considered irrational. *See City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 446 (1985) (attenuated relationship between challenged classification and asserted goal renders legislation arbitrary or irrational).

### G.   Curbing Prior Abuses Under § 1988

As a final attempt to justify the prisoner/non-prisoner distinction in the application of § 1997e(d)(2), the defendants and intervenors suggest that the cap on attorneys' fees in prisoner cases will curb abuses of § 1988 that have been prevalent in the past.  In making that argument, however, they rely upon the perception that plaintiffs' attorneys are reaping windfall awards for minor monetary judgments.    This argument, as alluded to earlier, has two major flaws.  First, the assertion fails to realize that vindication of constitutional rights is not always quantifiable solely by monetary damage awards.  Furthermore, both the statute itself and Supreme Court jurisprudence require that the district court, in awarding attorneys' fees to a successful plaintiff, take numerous factors into consideration, not the least of which is the relief actually ordered.  Given such realizations and given the protections afforded by judicial oversight of attorneys' fee awards, there is *no* rational basis for the distinctions drawn by the challenged statutory provision.

### III.

In arguing that the provisions of § 1997e(d)(2) withstand rational basis review, the defendants and intervenors also contend that we are bound in this matter by our recent decision in *Hadix*.  The majority also, although recognizing

the magistrate judge in this matter indicated, however, the permissible objective of protecting the public fisc cannot be implemented "by arbitrarily singling out a particular class of persons to bear the entire burden of achieving that end." *Walker v. Bain*, 65 F. Supp.2d 591, 604 (E.D Mich. 1999).

Obviously, eliminating *all* awards of attorneys fees in prison litigation would protect money in the public treasury. By enacting § 1988, however, Congress, in its wisdom, has chosen to award reasonable attorneys' fees to successful civil rights litigants. Invocation of the "protect the public fisc" mantra, by itself, thus adds little substance to the constitutional debate before us on this appeal. Once Congress has determined that fee awards are appropriate in § 1983 litigation, established judicial guidelines for determining responsible compensation for civil rights lawyers adequately protect the government's operating budget. To limit now such awards only for successful plaintiffs who happen to be incarcerated not only trivializes constitutional protections, but also discriminates in an irrational and unjust manner. *But see Madrid*, 190 F.3d at 996.

### F. Limiting Disruption From Prison Litigation On Prison Operations

The defendants and intervenors also submit that limiting the attorneys' fees awarded in successful civil rights suits would enhance prison operations by increasing morale and minimizing the time prison officials must spend away from their jobs. To give any credence to such an argument, however, is literally tantamount to elevating absurdity to the level of rationality.

First, as noted previously, limiting attorneys' fees does nothing to impinge upon the protected right of access to the courts for redress of constitutional violations. Short of an improper restriction of such a freedom, prison officials will not be insulated by an attorneys' fee cap from demands on their time for administrative hearings, depositions, and court proceedings. In fact, even if all prisoner civil rights suits were prosecuted *pro se*, the relevant prison officials would

(ii) the fee was directly and reasonably incurred in enforcing the relief ordered for the violation.
(2) Whenever a monetary judgment is awarded in an action described in paragraph (1), a portion of the judgment (not to exceed 25 percent) shall be applied to satisfy the amount of attorney's fees awarded against the defendant. If the award of attorney's fees is not greater than 150 percent of the judgment, the excess shall be paid by the defendant.
(3) No award of attorney's fees in an action described in paragraph (1) shall be based on an hourly rate greater than 150 percent of the hourly rate established under section 3006A of Title 18, for payment of court-appointed counsel.
(4) Nothing in this subsection shall prohibit a prisoner from entering into an agreement to pay an attorney's fee in an amount greater than the amount authorized under this subsection, if the fee is paid by the individual rather than by the defendant pursuant to [42 U.S.C. § 1988].

42 U.S.C. § 1997e(d) (footnotes omitted).

We are confronted with two issues concerning § 1997e(d)(2): first, whether this provision is inapplicable to attorney fee awards that are in excess of 150 percent of the judgment; and second, whether this provision violates the Equal Protection component of the Fifth Amendment to the United States Constitution. We review *de novo* the issue of statutory interpretation, *see Henry Ford Health Sys. v. Shalala*, 233 F.3d 907, 910 (6th Cir. 2000), and the challenge to the constitutionality of a federal statute. *See Singleton v. Smith*, 241 F.3d 534, 538 (6th Cir. 2001).

### 1. Interpretation of PLRA § 803(d)(2), 42 U.S.C. § 1997e(d)(2)

Walker contends that the second sentence of § 1997e(d)(2) is inapplicable to his situation, *i.e.*, where an award of attorney fees is greater than 150 percent. Section 1997e(d)(2) provides that: "Whenever a monetary judgment is awarded . . . , a portion of the judgment (not to exceed 25 percent)

shall be applied to satisfy the amount of attorney's fees awarded against the defendant. *If the award of attorney's fees is not greater than 150 percent of the judgment, the excess shall be paid by the defendant.*" 42 U.S.C. § 1997e(d)(2) (emphasis added).

Walker contends that, because the second sentence of § 1997e(d)(2) is silent on the extent of an attorney fee award where such an award is greater than 150 percent of the judgment, it is inapplicable to his situation. Walker suggests that, had Congress intended to limit an award of attorney fees in the event the award was greater than 150 percent of the judgment, it could have stated this expressly.

The court below rejected Walker's contention, finding that Walker's interpretation of § 1997e(d)(2) would render the 150 percent cap meaningless. *See Walker v. Bain*, 65 F. Supp. 2d 591, 598 (E.D. Mich. 1999). The court noted that, under the plain language of the statute, a defendant is liable for only the difference between the 150 percent limit and the amount of the judgment used to satisfy the fee award. *See id*. The court suggested that, while a court could theoretically make an award of fees that is well above 150 percent of the judgment, the defendant would be liable only for an amount up to the 150 percent limit. *See id*.

In resolving this question of statutory interpretation, we must first look to the language of the statute itself. *See Bd. of Educ. of Westside Cmty. Sch. v. Mergens*, 496 U.S. 226, 237 (1990); *United States v. Bailey*, 228 F.3d 637, 638 (6th Cir. 2000). "We read statutes and regulations with an eye to their straightforward and commonsense meanings." *Henry Ford Health Sys. v. Shalala*, 233 F.3d 907, 910 (6th Cir. 2000). We ascertain the plain meaning of a statute by reviewing "the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988). "When we can discern an unambiguous and plain meaning from the language of a statute, our task is at an end." *Bartlik v. United States Dep't of Labor*, 62 F.3d 163, 166 (6th Cir.1995) (*en banc*).

perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

Moreover, § 1997e(d)(1) itself requires that the amount of any fee awarded be "proportionately related to the court ordered relief for the violation," and "directly and reasonably incurred in enforcing the relief ordered for the violation." 42 U.S.C. §§ 1997e(d)(1)(B)(i) and (ii).

In *Hadix*, we upheld the PLRA's legislative determination of a reasonable *rate* for legal services for prisoner civil rights claims. Once that rate is established at a level that does not constitute an unconstitutional taking of a lawyer's time and expertise, federal courts themselves are directed to ensure that attorneys' fee awards are commensurate with the effort expended and the relief obtained. In fact, district judges must undertake an evaluation of the appropriate time that should have been spent on such a case and must disallow any attempt to recover compensation for legal work not required to prevail on the claims asserted. Adherence to such sound legal principles prevents windfall awards without irrationally differentiating between successful prison civil rights cases and other civil rights cases. Consequently, this purported rationale for distinguishing between the two types of cases also fails to pass constitutional muster, even under a deferential rational basis analysis.

### E. Protecting The Public Fisc

Without question, the desire to protect public funds is a laudable and legitimate goal of legislation. In fact, the majority seizes upon this rationale as its second justification for the purported legitimacy of the challenged legislation. As

### D.  Preventing Windfall Fee Awards For Attorneys

The next rationalization offered by the defendants and the intervenors for the PLRA's fee cap is the need to prevent attorneys representing prisoners from collecting large fees for their services in cases in which they obtain only small or nominal damage awards.  It is this proposed justification, however, that overlaps other arguments articulated by the defendants and intervenors and that crystallizes the exact reason why the provisions of § 1997e(d)(2), in contrast to the provisions of § 1997e(d)(3) at issue in *Hadix*, are so lacking in a rational basis.

Attorneys appointed to represent prisoners raising successful, non-frivolous § 1983 claims, like other attorneys seeking fees under 42 U.S.C. § 1988, are not entitled to unlimited fee awards merely upon application for such remuneration.  Instead, the judiciary has established a strict system of court oversight designed to tailor attorneys' fees to the merits of an individual case.  Specifically, as explained by the United States Supreme Court:

> [T]he very nature of recovery under § 1988 is designed to prevent any such "windfall" . . . [because] fee awards, properly calculated, by definition will represent the reasonable worth of services rendered in vindication of a plaintiff's civil rights claim.  It is central to the awarding of attorney's fees under § 1988 that the district court judge, in his or her good judgment, make the assessment of what is a reasonable fee under the circumstances of the case.

*Blanchard v. Bergeron*, 489 U.S. 87, 96 (1989).

In arriving at an appropriate fee award, the court must examine and balance numerous factors identified by the Supreme Court.  In *Hensley v. Eckerhart*, 461 U.S. 424, 430 n.3 (1983), the Court listed the following factors to consider:

(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to

We may not, however, rely on the literal language of the statute where such reliance would lead to absurd results or an interpretation which is inconsistent with the intent of Congress.  *See United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989); *Appleton v. First Nat'l Bank of Ohio*, 62 F.3d 791, 801 (6th Cir. 1995).  Every word in the statute is presumed to have meaning, and we must give effect to all the words to avoid an interpretation which would render words superfluous or redundant.  *See Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 112 (1991); *Menuskin v. Williams*, 145 F.3d 755, 768 (6th Cir. 1998).

While Walker's interpretation of § 1997e(d)(2) is consistent with the literal language of the statute, it is inconsistent with the intent of Congress, renders the second sentence of the provision meaningless, and must therefore be rejected.  Under Walker's theory:  if the fee award is less than 150 percent of the damages, § 1997e(d)(2) applies and defendants are liable for the full amount of the award; if the award of fees is greater than 150 percent of the damages, defendants are liable for the full amount of the award under pre-PLRA law.  Under this interpretation, the statute would not have any effect on the court's power to award, or the defendants' obligation to pay, attorney fees.  Accordingly, Walker's interpretation renders the second sentence of § 1997e(d)(2) meaningless.

We believe that § 1997e(d)(2) must be read to limit defendants' liability for attorney fees to 150 percent of the money judgment.[2]  We note that this interpretation is consistent with that of the few courts that have addressed the issue.  *See, e.g., Collins v. Montgomery County Bd. of Prison Inspectors*, 176 F.3d 679, 683 (3d Cir. 1999) (noting that § 1997e(d)(2) "provides that the fees awarded cannot exceed 150% of the judgment"); *Blissett v. Casey*, 147 F.3d 218, 220 (2d Cir. 1998) (stating that § 1997e(d)(2) "appears (in unclear language) to provide that the [fee award] is not to be borne by

---

[2]We caution that if non-monetary relief is obtained, either with or without money damages, § 1997e(d)(2) would not apply.  *See Boivin v. Black*, 225 F.3d 36, 41 n.4 (1st Cir. 2000).

the defendant to the extent it exceeds 150 percent of the judgment"); *cf. Bovin v. Black*, 225 F.3d 36, 38 (1st Cir. 2000) (stating that "when a prisoner secures a monetary judgment in a civil action covered by the PLRA, [§ 1997e(d)(2)] caps the defendants' liability for attorneys' fees at 150% of the judgment").

Because we find that § 1997(d)(2) is fully applicable here, and thus serves to cap Walker's attorney fee award at 150 percent of the judgment, we proceed to the issue of whether this provision violates Equal Protection.

**2.  Constitutionality of  PLRA § 803(d)(2), 42 U.S.C. § 1997e(d)(2)**

Since the PLRA fee cap neither involves a suspect classification nor infringes on the fundamental right of access to the courts, we analyze its constitutionality under the rational basis test.[3]  *See Hadix v. Johnson*, 230 F.3d 840, 843 (6th Cir. 2000).  Under rational basis review, a law is valid if it "rationally furthers a legitimate [governmental] interest." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992); *see also Romer v. Evans*, 517 U.S. 620, 632 (1996) ("[I]f a law neither burdens a fundamental right nor targets a suspect class, we will uphold the legislative classification so long as it bears a rational relation to some legitimate end.").

Under rational basis review, the statute will be accorded a strong presumption of validity, and we must uphold the

---

[3]The dissent points out, and we agree, that the statutory provision at issue here "ha[s] a disparate impact on suspect classes and on individuals exercising fundamental rights."  We are sensitive to the very high degree of disproportionality in the incarceration rates for blacks compared to whites.  We too believe that this subgroup of prisoners, as well as other minorities, fall victim to a disproportionately higher rate of "acts of brutality, excessive force, retaliation, and deliberate indifference."  We share the concerns raised by the dissent in this regard.  Our decision today rests not on a desire to sanction or facilitate such criminal and unconstitutional acts, and should not be so read.  Rather, our decision is based squarely on Sixth Circuit precedent.

---

greater of the average monthly balance in his account or the average monthly balance in his account for the six months preceding the filing of his complaint, *see* § 1915(b)(1)(A) and (B), as well as the non-economic consideration that if his suit is deemed frivolous he will be assessed one strike toward the maximum of three that will prevent him from filing any more suits without prepayment of the full filing fee except in the one situation in which he faces an imminent threat of serious physical injury. *See* § 1915(g).

117 F. Supp. at 896.  Thus, I cannot believe that the governmental interest in reducing the proliferation of so-called "trivial" suits in any way justifies, or is rationally related to, the draconian efforts to limit fees awarded in successful civil rights cases.

### C. Reducing Intervention Of Federal Courts Into Prison Management

Equally unpersuasive is the intervenors' proffered justification that capping attorneys' fees awards will reduce federal court intrusions into daily prison management matters. Because most prisons are still arms of state government, the officials in charge of those institutions remain subject to the rule of law as defined by the constitution and as interpreted by the courts.  To the extent that litigants are able to establish constitutional violations by prison officials, the courts are duty-bound to rectify those transgressions.  Any attempt, therefore, to restrict such relief unconstitutionally subverts bedrock principles lying at the core of our federal system of government.

Additionally, restricting the remuneration available to *attorneys* in no way limits the relief granted by a federal court to remedy a constitutional violation. Once again, the obvious lack of relationship between the result sought and the means chosen to gain that end ratifies the magistrate judge's determination that this ground is anything but a rational basis for the statutory enactment.

find this argument advanced by the defendants and the intervenors both disconcerting and offensive. First, it is puzzling that the defendants and governmental intervenors can unabashedly term any vindication of constitutional rights "trivial" or "insignificant." To do so denigrates the sacrifices of millions of American men and women who have struggled and died, both at home and abroad, to protect the very freedoms guaranteed by our constitution. Second, the amount of a monetary damage award should not be equated with the significance of the rights secured or protected in any legal action. I am confident that even the majority would not confine the value of liberties such as a woman's right to vote or an African-American's right to sit at a lunch counter to some economic calculation. Similarly, for example, it would not be at all surprising in a prison setting that the value to an inmate of a prospective court ruling forbidding guards from beating him in retaliation for filing a successful grievance would far outweigh any minimal or nominal monetary amount associated with such a judicial order.

Finally, it would be foolhardy for us to think that the litigants filing § 1983 suits from prison would be less likely to seek vindication of perceived constitutional wrongs because of a congressionally-imposed limit on attorneys' fee awards. Almost all prisoner civil rights cases are now filed *pro se*, *pro bono*, or by dedicated public interest organizations whose representation decisions are not driven by the possibility of personal pecuniary gain. As recognized by the court in *Johnson v. Daley*:

> [I]t is irrational to conclude that [a *pro se* prisoner] bases his decision [to file a civil rights claim] on the distant possibility that at some future time, his presently non-existent lawyer might recover a smaller rather than a larger amount of fees. . . . A prisoner may harbor hopes of a substantial monetary award (as do non-prisoner plaintiffs), but he has no reason to take into consideration the size of the fee award to his counsel. It is far more likely that the prisoner takes into consideration the immediate economic impact of giving up 20% of the

statute "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Heller v. Doe*, 509 U.S. 312, 319-20 (1993) (quoting *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993)). The government has no obligation to produce evidence to support the rationality of its statutory classifications and may rely entirely on rational speculation unsupported by any evidence or empirical data. *See Beach Communications*, 508 U.S. at 315. Consequently, Walker bears the heavy burden of negating every conceivable basis that might support it. *See Heller*, 509 U.S. at 320; *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973).

Walker contends that § 1997e(d)(2) violates Equal Protection because it burdens only prisoners and does not advance any legitimate government interest. He argues that § 1997e(d)(2) is the product of animus towards prisoners. The court below agreed with Walker, finding that § 1997e(d)(2) was not rationally related to any legitimate government interest.

Bain and Metzger, the United States, and the State of Ohio (collectively, "the government") urge this Court to reverse the district court, and find that § 1997(d)(2) is not an unconstitutional violation of the Equal Protection component of the Fifth Amendment. The government argues that there is a rational relationship between the statute's classification and several legitimate government interests, which include: (1) deterring the filing of frivolous prisoner civil rights claims; (2) reducing trivial or inconsequential suits; (3) reducing judicial intervention into the management of prisons; (4) preventing windfall fee awards; (5) and protecting the public fisc. We need only address two of these proffered interests, as we are not writing on a clean slate.

In *Hadix v. Johnson*, this Court held that § 1997e(d)(3) of the PLRA, which imposes a cap on the hourly rate for attorney fees that prisoners may recover, while leaving non-prisoner plaintiffs free to recover reasonable attorney fees at the prevailing market rate, did not violate Equal Protection.

230 F.3d 840, 842 (6th Cir. 2000). There, we concluded that Congress could rationally intend § 1997e(d)(3) to decrease "marginal or trivial lawsuits." We reasoned that, since the PLRA would cause attorneys to require a greater likelihood of success before taking a case, many trivial claims would have to be litigated by prisoners *pro se*. Further, while some prisoners would continue the litigation of their marginal claims, we found it reasonable to conclude that at least some would be dissuaded by the fact that they would have to shoulder the entire workload themselves. *Hadix*, 230 F.3d at 845.

In *Hadix,* we also concluded that § 1995e(d)(3) is rationally related to the government's legitimate interest in protecting state and federal treasuries. *Id*. We reasoned that Congress could have rationally concluded that prisoner civil rights litigation leads to attorney fees which are often disproportionate to the harm or injury. Thus, by reducing the number of marginal, albeit meritorious claims, some government resources would be preserved.

The government asserts that our decision in *Hadix* is dispositive on the issue of whether § 1997e(d)(2) violates Equal Protection. We must agree. In *Hadix* we held that the twin goals of decreasing marginal lawsuits and protecting the public fisc are legitimate government interests, and that decreasing an attorney fee award in the context of prisoner civil rights litigation serves both of these interests. Accordingly, *Hadix* necessarily dictates our finding that § 1997e(d)(2) survives rational level scrutiny. Indeed, it seems that our reasoning in *Hadix* is better supported here, since § 1997e(d)(2) is more likely to decrease the number of marginal lawsuits, and thus more likely to protect the public fisc, than § 1997e(d)(3). Attorneys will be dissuaded from taking prisoner civil rights cases by both of these provisions, but probably more so by § 1997e(d)(2). While § 1997(d)(3) merely caps the hourly rate for attorney fees that prisoners may recover, § 1997e(d)(2) serves to ensure that attorneys will be left uncompensated for their efforts whenever the plaintiff's recovery is meager. Because "rational attorney[s]

discrimination that can *only* be viewed as arbitrary and irrational *will* violate the Equal Protection Clause." *Id.*

### A.  Reducing Frivolous Litigation

The first justification offered by the defendants and intervenors in this case as a basis for the disparity in treatment between prisoners and non-prisoners regarding attorneys' fees is Congress's desire to curb the rising tide of frivolous litigation initiated by incarcerated plaintiffs. Assuming that such an intent is indeed rational and justifiable, it is clear that there is no rational relationship between the disparate treatment mandated by the PLRA and the governmental interest to be fostered. Because attorneys' fees are awarded only to plaintiffs who can successfully demonstrate constitutional injury, "frivolous" filings are dismissed well before any calculation of attorneys' fees comes into play. Capping the amount of fees to be paid to a "prevailing party," therefore, bears absolutely no logical relationship to a desire to eliminate suits that by definition have no chance of succeeding. Reliance upon this line of argument for support for the challenged legislation is thus anything but rational.

Moreover, the 150% *attorneys' fee* cap does not affect the chance of the litigant's success on the merits of the suit and would not, therefore, enter into any calculus into which a hypothetical, incarcerated plaintiff would delve prior to lodging a complaint in federal court. "To be sure, Congress's goal of reducing the number of prisoners who file frivolous lawsuits is a laudable goal. However, the attorney fees cap does not play any role in achieving this goal." *Johnson v. Daley*, 117 F. Supp.2d 889, 900 (W.D. Wisc. 2000). *But see Boivin v. Black*, 225 F.3d 36, 44-46 (1st Cir. 2000); *Madrid v. Gomez*, 190 F.3d 990, 996 (9th Cir. 1999).

### B.  Deterring Trivial Or Inconsequential Suits

Curiously, one of the two rationales discussed in the majority opinion for limiting the total amount of a fee award in this case is the need to discourage lawsuits that, although meritorious, are considered "trivial" or not "significant." I

of this country's prison population makes it probable that civil rights claims are filed most often by members of groups deemed by society to be "minorities." I would expect, for example, that a statistically disproportionate number of allegations of constitutional violations in our country's prisons are filed by African-American males who, although constituting only six percent of the general population, account for almost half of the two million persons incarcerated in American jails and prisons. *See* Press Release, U.S. Department of Justice, Bureau of Judicial Statistics ( M a r .  2 5 ,  2 0 0 1 ) ,  *a v a i l a b l e  a t* http://www.ojp.usdoj.gov/bjs/pub/press/pjim00pr.htm.; *Gustavo    Capdevila,   U.N.   Hears   Complaints   of Justice    System's    Racism,* AFRICAN    PERSPECTIVE (N O .       4 7 )  ( S e p t .    2 ,  2 0 0 0 ) ,  a t http://www.africanperspective.com/html47/AfAmn.html.; *Michael B. Hancock and Peter C. Groff, From African Kingdoms To American Slave Plantations To American Prisons . . . It's Time To Act!, Univ. of Denver-Center for African American Policy (April 1999), available at* http://www.du.edu/caap/april1999.html. Similarly, it does not strain credulity to suppose that the vast majority of recorded acts of brutality, excessive force, retaliation, and deliberate indifference in our prisons are not committed against the powerful or "accepted" segments of society, but rather against racial and ethnic minorities, adherents of unpopular or misunderstood religions, and individuals of "unaccepted" sexual orientations.

## II.

Even applying the rational basis review employed by the majority, however, I am convinced that the portion of the Prison Litigation Reform Act challenged in this appeal cannot withstand probing, analytical scrutiny. Although rational basis review does afford a strong presumption of validity to the enactment at issue as long as "there is a rational relationship between the disparity of treatment and some legitimate government purpose," *Hadix*, 230 F.3d at 843, it "is not a rubber stamp of all legislative action, as

w[ill] demand a greater likelihood of success before taking a prisoner's case," some prisoners with "marginal or trivial" claims "will be dissuaded by the fact that they will have to shoulder the entire workload themselves." *Hadix*, 230 F.3d 845.

Walker has asserted no valid grounds for distinguishing between §§ 1997e(d)(2) and 1997e(d)(3), other than to state the obvious: the two provisions are different. Walker notes that § 1997e(d)(2) differs from § 1997e(d)(3) in that the former requires 25 percent of the attorney fee award to be paid out of the plaintiff's recovery. While this is true, this requirement merely buttresses the position that § 1997e(d)(2) is rationally related to serving the purposes of decreasing marginal prisoner lawsuits and protecting the public fisc. Walker also attempts to distinguish the two provisions by suggesting that the government's interpretation of § 1997e(d)(2) precludes an award of attorney fees where the attorney fee award is greater than 150 percent of the judgment. However, the government's position, which we have endorsed, is that § 1997e(d)(2) merely caps the defendants' liability for an attorney fee award at 150 percent of the money judgment. As there is no relevant distinction between §§ 1997e(d)(2) and 1997e(d)(3), Walker's constitutional challenge is foreclosed by our reasoning in *Hadix*.

We note that two of our sister circuits have considered and rejected Equal Protection challenges to § 1997e(d)(2). *See Boivin v. Black*, 225 F.3d 36, 46 (1st Cir. 2000) ("Because a cap on attorneys' fees, particularly when linked with the requirement that the prisoner contribute part of the award to the payment of the fee, *see* 42 U.S.C. § 1997e(d)(2), conceivably may discourage prisoners and their counsel from filing frivolous or low-value suits, we think that the fit is close enough to pass constitutional muster."); *Madrid v. Gomez*, 190 F.3d 990, 996 (9th Cir. 1999) ("Under [rational basis review], the PLRA certainly passes constitutional muster."). The Third Circuit, sitting *en banc*, split on the issue. *See Collins v. Montgomery County Bd. of Prison*

*Inspectors*, 176 F.3d 679, 686 (3d Cir. 1999) (*en banc*) (noting that the court was "divided equally on the question of whether the limitation of the fees to 150% of the judgment is constitutional").

We are aware that § 1997e(d)(2) will have a strong chilling effect upon counsels' willingness to represent prisoners who have meritorious claims. We are also mindful that the "marginal or trivial" claims that result in a judgment for a prisoner, such as Walker, do in fact arise out of an actual, proven civil rights violation. We admit to being troubled by a federal statute that seeks to reduce the number of meritorious civil rights claims and protect the public fisc at the expense of denying a politically unpopular group their ability to vindicate actual, albeit "technical," civil rights violations. However, we are aware that we are not authorized to act as a "'superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines.'" *Heller v. Doe*, 509 U.S. 312, 319 (1993) (*quoting New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) (per curiam)). Moreover, our role is not "'to judge the wisdom, fairness, or logic of legislative choices.'" *Id.* (*quoting FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993)). Accordingly, we must conclude that § 1997e(d)(2) survives rational review.

**B. Cross-Appeal**

Walker argues that he is entitled to a new trial on several grounds. First, he contends that the magistrate gave an erroneous jury instruction that affected his substantial rights. Second, he asserts that he is entitled to a new trial because the magistrate erred in allowing defendants' counsel to question Walker about medical documents concerning Walker's alleged injuries. Finally, he argues that he is entitled to a new trial on the issue of damages because the jury's award of $1 in compensatory damages was against the weight of evidence and inconsistent with its award of punitive damages.

---

## CONCURRING IN PART, DISSENTING IN PART

---

MARTHA CRAIG DAUGHTREY, Circuit Judge, concurring in part, dissenting in part. In *Hadix v. Johnson*, 230 F.3d 840 (6th Cir. 2000), we found no constitutional deficiencies in the provisions of 42 U.S.C. § 1997e(d)(3), the precursor to congressionally sanctioned denigration of prisoners filing civil rights actions. Today, we take the additional step of holding that prisoners, and persons attempting to assist them, are less worthy of basic constitutional protections than are unincarcerated civil rights litigants. In order to register my protest to this unfortunate ruling, I respectfully dissent from the majority's holding in Part II.A.2. of its opinion. In all other respects, however, I concur in the majority's judgment and analysis.

### I.

In upholding the constitutionality of the fee cap provision of 42 U.S.C. § 1997e(d)(2), the majority first assumes that the statutory restriction "neither involves a suspect classification nor infringes on the fundamental right of access to the courts." Given the broad language with which the statute is written, I am constrained to agree with my colleagues on this point and thus apply deferential rational basis review to the plaintiff's constitutional challenge.

I take this opportunity, however, to point out that we, as a court and as a nation, would be naive to think that the statute did not have a disparate impact on suspect classes and on individuals exercising fundamental rights. The annals of human history are replete with accounts of atrocities committed against persons viewed as "different" by those individuals wielding political power and military might. Thus, it would be surprising indeed to find that American prisons were any more solicitous of differences in race, ethnicity, religion, or sexual orientation than is American society as a whole. Moreover, the demographic composition

### III.  CONCLUSION

For the foregoing reasons, we **REVERSE** the magistrate's order holding that § 803(d)(2) of the PLRA, 42 U.S.C. § 1997e(d)(2), violates Equal Protection.  We **VACATE** the order granting in part Walker's motion for attorney fees, and **REMAND** for redetermination of fees under the PLRA. Finally, we **AFFIRM** the magistrate's order denying Walker's motion for new trial.

### 1.  **Standard of Review**

We review the denial of a motion for a new trial under Fed. R. Civ. P. 59 for an abuse of discretion. *See Greenwell v. Boatwright*, 184 F.3d 492, 499 (6th Cir. 1999); *Wayne v. City of Sebring*, 36 F.3d 517, 525 (6th Cir.1994).  "Abuse of discretion is defined as a definite and firm conviction that the trial court committed a clear error of judgment." *See Powers v. Bayliner Marine Corp.*, 83 F.3d 789, 796 (6th Cir.1996). To constitute proper grounds for granting a new trial, an error, defect or other act must affect the substantial rights of the parties. *See* Fed. R. Civ. P. 61.  "The trial court should deny such a motion if the verdict is one that reasonably could be reached, regardless of whether the trial judge might have reached a different conclusion were he the trier of fact." *Wayne*, 36 F.3d at 525; *Anchor v. O'Toole*, 94 F.3d 1014, 1021 (6th Cir.1996).

### 2.  **Jury Instructions**

We begin by addressing defendants' contention, raised for the first time on appeal, that Walker's motion for a new trial was untimely.  Defendants' argument is not well-taken.

Fed. R. Civ. P. 59(b) provides that "[a]ny motion for a new trial shall be filed no later than 10 days after entry of the judgment."  Walker filed his motion for new trial 10 days after entry of the amended judgment.  The magistrate noted that Walker's motion was timely, as the 10-day period began to run from the date of the amended judgment rather than the original judgment.  The magistrate concluded that, because the amended judgment altered the legal rights and obligations of the parties, it triggered a new 10-day period from which the parties could file Rule 59 motions.

Defendants do not dispute the magistrate's conclusion that the amended judgment triggered a new 10-day period. Rather, they argue that because Walker "could have" brought his motion earlier, his motion should have been dismissed as untimely.  Defendants do not purport to base their contention on case law or the Rules; rather, they appeal to considerations

of equity and finality. We reject their contention as unsupported. Accordingly, we move to the merits of Walker's claim.

Walker argues that he is entitled to a new trial because the court gave an erroneous jury instruction. Specifically, the court instructed the jury that Walker had to prove as an element of his First Amendment retaliation claims that defendants' actions "shock the conscience." We agree that this instruction was erroneous, but do not find it to be sufficiently prejudicial such that a new trial is warranted.

"When instructions are challenged on appeal, our duty is not to read the instructions word for word in search of an erroneous word or phrase." *Wilson v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 83 F.3d 747, 757 (6th Cir. 1996) (*quoting O-So Detroit, Inc. v. Home Ins. Co.*, 973 F.2d 498, 502 (6th Cir.1992)). Rather, we review the instructions "as a whole in order to determine whether they adequately inform the jury of the relevant considerations and provide a basis in law for aiding the jury to reach its decision." *Beard v. Norwegian Caribbean Lines*, 900 F.2d 71, 72 (6th Cir.1990).

We believe that the erroneous jury instruction did not result in unfair prejudice to Walker due to the magistrate's use of special interrogatories.[4] The magistrate pursued this course

---

[4]On issues of liability, the special interrogatories asked the jury to answer the following questions as to each defendant:
1.  a. Did defendants ransack or trash plaintiff's cell on April 4, 1995?
    b. Did defendants improperly confiscate and remove papers and/or other property from plaintiff's cell on April 4, 1995?
    c. If you answered "yes" to either Question 1a or Question 1b, was the fact that plaintiff had previously filed grievances and lawsuits against the defendants or their colleagues a substantial or motivating factor behind that conduct?
    d. If you answered "yes" to either Question 1a or Question 1b, and "yes" to Question 1c, did the conduct of

*v. Uniroyal, Inc.*, 661 F.2d 542, 546 (6th Cir.1981). The remedy of a new trial for inadequate damages is appropriate only where the evidence indicates that the jury awarded damages in an amount substantially less than unquestionably proved by the plaintiff's uncontradicted and undisputed evidence. *See Anchor*, 94 F.3d at 1021. Thus, if the verdict is supported by some competent, credible evidence, a trial court will be deemed not to have abused its discretion in denying the motion. *See id.*

The fact that the defendants did not rebut Walker's testimony directly does not necessarily render the jury's determination on the issue of damages against the great weight of evidence. Walker had the burden of proving damages, and the only evidence of damages was Walker's self-serving testimony about his mental distress. This is not a case where the jury disregarded clear, objective and uncontradicted evidence. The jury was free to accept or disregard Walker's statement, and it chose to disregard it. There is no error in upholding civil rights jury verdicts awarding no compensatory damages where the plaintiff's sole evidence of damages is his or her own testimony of subjective injuries. *See Robinson v. Cattaraugus County*, 147 F.3d 153, 160 (2d Cir. 1998); *Biggs v. Marshall*, 93 F.3d 355, 360-61 (7th Cir. 1996); *Davet v. Maccarone*, 973 F.2d 22, 29-30 (1st Cir. 1992).

We also note that it was not inconsistent for the jury to conclude that defendants' conduct was malicious enough to justify punitive damages, but that Walker suffered no actual, compensable injuries as a result. In civil rights cases, punitive damages may be awarded in the absence of a compensatory award. *See Carlson v. Green*, 446 U.S. 14, 22 n.9 (1980); *Robinson v. Cattaraugus County,* 147 F.3d 153, 161 (2d Cir. 1998). The jury's failure to award compensatory damages was not against the great weight of the evidence, nor was it inconsistent with its award of punitive damages.

### 3. Prejudicial Evidence

Next, Walker contends that he is entitled to a new trial because the court below erred in permitting defendants' counsel to question Walker, in front of the jury, about the absence of his medical records. Walker argues that this line of questioning was irrelevant and highly prejudicial, and such conduct tended to mislead the jury.

Importantly, Walker did not object to the allegedly prejudicial conduct at trial, nor did he raise the issue in his Fed. R. Civ. P. 59 motion. Accordingly, we decline to consider this argument for reversal of the lower court on this basis. *See Harshbarger v. Pees*, 66 F.3d 775, 777 n. 3 (6th Cir.1995).[7]

### 4. Damages

Lastly, Walker claims that he is entitled to a new trial on the issue of damages because the award of damages was against the manifest weight of the evidence. Walker argues that he presented evidence of pain, suffering and mental anguish, and that the defendants did not rebut this evidence. Specifically, Walker notes that he testified that defendants' conduct affected his sleeping and his willingness to exercise his First Amendment rights in the future. Moreover, he argues that the jury's award of nominal compensatory damages is inconsistent with its award of punitive damages and is against the weight of the evidence.

The scope of review of a damage award is extremely narrow. A trial court may not grant a new trial on the ground of insufficient damages unless the jury verdict is one that could not reasonably have been reached. *See Anchor v. O'Toole*, 94 F.3d 1014, 1021 (6th Cir. 1996); *TCP Indus., Inc.*

---

[7] Even if we were to find Walker's claim properly before the Court, we would reject it on the merits. Assuming, *arguendo*, the district court erred in allowing the counsel to question Walker in this regard, Walker has failed to demonstrate that the error affected his substantial rights.

because it was unclear at the time of trial whether Walker's First Amendment retaliation claims were governed by the First Amendment standard[5] or the heightened Fourteenth Amendment substantive due process standard.[6] *See, e.g.,*

---

defendants amount to an egregious abuse of power; that is, was it conduct which shocks the conscience?
2. a. Did defendants, independently or collectively, verbally threaten and attempt to intimidate plaintiff because of his previous and anticipated lawsuits and grievances?
   b. If you answered "yes" to Question 2a, did the conduct of defendants amount to an egregious abuse of power; that is, was it conduct which shocks the conscience?
3. a. Did defendant Bain pull plaintiff's handcuffed arms and wrists through his cell door food slot on April 4, 1995 with the intent to injure or inflict pain?
   b. If you answered "yes" to Question 3a, was the fact that plaintiff had previously filed grievances and lawsuits against the defendant or his colleague a substantial or motivating factor behind defendant Bain's action?
   c. If you answered "yes" to both Question 3a and 3b, did defendant [Metzger] improperly and intentionally allow defendant Bain to injure plaintiff?
   d. If you answered "yes" to Question 3c, was the fact that plaintiff had previously filed grievances and lawsuits against defendant or his colleague a substantial or motivating factor behind defendant [Metzger's] action?
   e. If you answered "yes" to Questions 3a and 3b, did the conduct of defendants amount to an egregious abuse of power; that is, was it conduct which shocks the conscience? Answer as to defendant [Metzger] only if you also answered "yes" to Questions 3c and 3d.
   f. If you answered "yes" to Question 3a, did plaintiff suffer physical injury and/or pain and distress as a result of that conduct?

(J.A. at 65-67). The jury answered "yes" only to Questions 1b and 1c.

[5] The First Amendment standard requires only that the plaintiff's protected conduct be a substantial motivating factor behind the defendants' action. *See Zilich v. Longo*, 34 F.3d 359, 364 (6th Cir. 1994).

[6] The Fourteenth Amendment substantive due process standard requires that the plaintiff's protected conduct be a substantial motivating factor behind the defendants' action, and that the defendants' action be

*Thaddeus-X v. Blatter*, 175 F.3d 378, 388 (6th Cir. 1999) (*en banc*) (noting that the Sixth Circuit had applied the substantive due process standard to retaliation claims based on the violation of an enumerated constitutional right).

According to the special verdicts, the jury found that both defendants improperly confiscated and removed Walker's personal papers from his cell, that Walker's previous filing of grievances and lawsuits was a substantial and motivating factor behind this conduct, but that the defendants' actions did not constitute an egregious abuse of power or otherwise shock the conscience. Following this Court's decision in *McLaurin v. Cole*, 115 F.3d 408, 411 (6th Cir. 1997), the magistrate applied the heightened "shocks the conscience" requirement to Walker's claims, and entered judgment in favor of defendants.

Subsequently, however, this Court issued an *en banc* decision in *Thaddeus-X v. Blatter*, 175 F.3d 378, 388 (6th Cir. 1999), which held that the heightened substantive due process standard did not apply to prisoner retaliation claims based on the violation of an enumerated constitutional right. Under the applicable standard, then, Walker had proven a First Amendment retaliation violation. Based on the *Thaddeus-X* decision, Walker filed a motion to alter or amend the judgment, seeking entry of judgment in his favor. The magistrate judge granted Walker's motion, and entered judgment in favor of Walker and against the defendants in the amount of $426.

The use of special interrogatories in the case clearly reveals that the erroneous jury instruction had no effect on the result. Had the case been submitted to the jury using a general verdict form, a new trial probably would have been justified. *See, e.g., Lewis v. City of Irvine, Kentucky*, 899 F.2d 451, 456-57 (6th Cir. 1990) (holding that a new trial was warranted as the trial court erroneously instructed the jury on the legal

---

shocking to the conscience. *See McLaurin v. Cole*, 115 F.3d 408, 410 (6th Cir. 1997).

standard applicable to the plaintiff's claim). Here, however, the magistrate wisely avoided prejudicial error and the necessity of a new trial by using the special interrogatories.

Walker contends that the erroneous jury instruction affected his substantial rights because the instruction misled and confused the jury, and that the use of special interrogatories did not cure this error. In support of this argument, Walker notes that several times during his counsel's closing arguments, he characterized defendants' conduct as egregious and shocking. He argues that counsel's argument would have been "substantially different and more persuasive" had he not had to focus on the burden of proof. Appellee's Br. at 62.

We do not believe that Walker's closing arguments are of any relevance in this context. Counsel's closing statements certainly are not relevant to the issues of whether the magistrate's jury "instructions, viewed as a whole, were confusing, misleading, or prejudicial," *Vance v. Spencer County Pub. Sch. Dist.*, 231 F.3d 253, 263 (6th Cir. 2000) (*quoting Innes v. Howell Corp.*, 76 F.3d 702, 714 (6th Cir. 1996) (quotation omitted)), or whether the erroneous jury instruction "affect[ed] the substantial rights of the parties." Fed. R. Civ. P. 61.

Moreover, Walker's argument misses the mark since, regardless of whether he had to show defendants' conduct shocked the conscience, he had to prove that the alleged unlawful conduct actually happened. The interrogatories reveal that he did not succeed in this regard. The jury's finding that the conduct did not happen rendered the erroneous jury instruction harmless. While the court's instruction required Walker to prove one additional element, it did not alter his burden to prove the other elements which underlie the retaliation claim. Therefore, we agree with the magistrate that the erroneous jury instruction did not affect Walker's substantial rights.