[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-11671
_____

D.C. Docket No. 4:14-cv-00465-RH-GRJ

MATTHEW JOHN THOMPSON,

Plaintiff-Appellant,

versus

B. SMITH,
Lt,
J. SIKES,
Capt,
D. ATKINS,
Co,
D. PRICE,
Co,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Florida
_____

(March 12, 2020)

Before MARTIN, ROSENBAUM, and BOGGS,* Circuit Judges.

MARTIN, Circuit Judge:

After a trial, a jury returned a verdict in Matthew Thompson's favor. The jury found that while Mr. Thompson was incarcerated, prison guards violated his First and Eighth Amendment rights by retaliating against him for filing grievances and "spray[ing] him with chemical agents" without a legitimate reason for doing so. But Mr. Thompson's victory was tempered with disappointment. Before trial, the District Court decided that because pepper spraying[1] does not cause a "physical injury" within the meaning of the Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e(e), Mr. Thompson could recover only nominal damages for his injuries. The District Court therefore granted Captain James Sikes, Officer Daniel Price, and Officer William Goff summary judgment on Mr. Thompson's claims for compensatory and punitive damages. This left the jury with no choice but to award Mr. Thompson just $10 in nominal damages after returning a verdict for him.

Mr. Thompson now appeals the District Court's grant of summary judgment on his claims for compensatory and punitive damages. He also appeals the District Court's attorney's fee award, its denial of reasonable litigation expenses, and its

---

* Honorable Danny J. Boggs, United States Circuit Judge for the Sixth Circuit, sitting by designation.

[1] Mr. Thompson was sprayed with oleoresin capsicum chemical agents. Oleoresin capsicum is colloquially known as "pepper spray," see Dalrymple v. United States, 460 F.3d 1318, 1328 (11th Cir. 2006), and we use that term in this opinion.

2

denial of his motion for an injunction. After careful consideration, and with the benefit of oral argument, we affirm in part, reverse in part, and remand for a retrial consistent with our opinion.

## I. FACTS

On the morning of March 10, 2014, Mr. Thompson was doing legal research in Liberty Correctional Institution's ("Liberty") law library when he was instructed to go see Captain Sikes at the "center gate." Mr. Thompson left the law library and reported to the center gate as ordered, taking his legal papers with him. When Mr. Thompson arrived, he saw Officer Price instead of Captain Sikes there. Officer Price told Mr. Thompson to empty his pockets and remove his shoes. According to Mr. Thompson, Officer Price then ripped Thompson's shoes apart; took his legal files; handcuffed him; and sent him to the medical unit for a pre-confinement physical to determine whether he could withstand being pepper sprayed. Mr. Thompson was then sent to "confinement," a detention area within Liberty where prisoners are denied certain privileges. Mr. Thompson was placed in a confinement cell with another inmate. To date, Mr. Thompson's confiscated legal files are still missing.

Once in confinement, Mr. Thompson was given his "disciplinary report" charge—that is, an explanation for why he was sent there. The disciplinary report stated Mr. Thompson was sent to "administrative confinement" for writing an

Inmate Request "in a very rude and disrespectful manner." Mr. Thompson testified at trial that he wrote the Inmate Request—although he recalled it as a formal grievance—in response to being denied Ibuprofen.

Per Liberty's disciplinary policy, Mr. Thompson was given the opportunity to file a statement in response to the disciplinary report charge. Mr. Thompson filed his response on March 15, 2014. In his response, he denied acting disrespectfully and alleged Captain Sikes "threaten[ed] to lock [him] in confinement" for as long as possible "because of [his] lawsuits [and] administrative grievances." Mr. Thompson also testified at trial the "real reason" Captain Sikes placed him in confinement was as punishment "for writing so many grievances about so many different issues."

After Mr. Thompson's response was filed, Captain Sikes came by his cell. Captain Sikes told Mr. Thompson, "You got my attention now," removed Thompson from his shared cell, and placed him in an isolation cell on the other side of the confinement block. The cell next to Mr. Thompson's was empty.

The following morning on March 16, 2014, Mr. Thompson was quiet in his cell. Officer Goff approached Mr. Thompson's cell and asked if it was him "making all of that noise, creating a disturbance." Mr. Thompson responded with "[c]ome on, man, it was quiet, it's Sunday morning." Officer Goff did not respond and walked away. Captain Sikes then walked by Mr. Thompson's cell. Mr.

4

Thompson stopped Captain Sikes as he was passing by and told Captain Sikes about his earlier exchange with Officer Goff. Captain Sikes informed Mr. Thompson he would "make a note of it" and walked off.

Captain Sikes then returned to Mr. Thompson's cell along with Officer Robert Hoffman, who was recording the interaction with a handheld video camera. The video recording showed the hallway was quiet and Mr. Thompson was not creating any disturbances when Captain Sikes and Officer Hoffman approached his cell. Captain Sikes informed Mr. Thompson that he needed to "cease and desist" being disruptive and, if he did not, he would be pepper sprayed. Mr. Thompson responded to Captain Sikes by asserting his "constitutional rights." Mr. Thompson and Captain Sikes spoke over each other during this conversation. Captain Sikes turned to the camera and asserted that Mr. Thompson was "still excited" and that he had been "counseled with." Mr. Thompson responded calmly that he was "not excited." Captain Sikes then instructed Officer Hoffman to turn off the camera, and Officer Hoffman did so.

Captain Sikes and Officer Hoffman left Mr. Thompson's cell, and a few minutes later Captain Sikes returned with Officer Goff. At the direction of Captain Sikes, Officer Goff pepper sprayed Mr. Thompson while he was still inside his cell. At trial, Mr. Thompson testified that as he was sprayed, he turned his head and watched behind him as the wall turned yellow, "except for a white spot where

5

[his] head was." Mr. Thompson also testified that Officer Goff pepper sprayed him once and described the effects of being pepper sprayed as: "It burns. I couldn't breathe. I had my eyes closed. Other inmates had told me not to hyperventilate, so I tried to stay calm." After Captain Sikes and Officer Goff administered the pepper spray, they left. Approximately twenty minutes later, Captain Sikes and Officer Goff returned to Mr. Thompson's cell. Upon his return, Captain Sikes asked Mr. Thompson if they had "an understanding," and Thompson replied they did and "[he] kn[ew] where [he was] at."

Captain Sikes and Officer Goff took Mr. Thompson from his cell to shower. According to Mr. Thompson, Captain Sikes forced him to take an extended shower so that the pepper spray would "r[un] into [his] armpits and . . . groin" to increase the burning sensation. After Mr. Thompson showered, Captain Sikes brought him to the medical ward for a checkup and then returned him to the same cell in which he was pepper sprayed. Mr. Thompson testified that the prison guards failed to clean the pepper spray residue from the cell, thus exposing him to the chemical agents again upon returning from the shower and medical ward. An inmate who joined Mr. Thompson in the cell the next day complained about the chemical agents and used his shirt to try to clean the residue off the wall.

The officers' recollection of these incidents was different than Mr. Thompson's version. At trial, Captain Sikes testified that before the pepper-spray

incident, he previously counseled Mr. Thompson about using cordial language in grievances and not "attack[ing] the person that he's writing a grievance about." On March 10, 2014, however, Mr. Thompson filed another grievance in a "disrespectful" tone. As a result, Captain Sikes gave Mr. Thompson a disciplinary report charge and sent him to confinement.

Captain Sikes testified that he checked on Mr. Thompson every day between March 10 and March 15. During that time, Captain Sikes did not recall responding to Mr. Thompson's allegations with "You got my attention now." And Officer Goff could not recall how or why Mr. Thompson was moved from a shared cell to isolation on March 15. He remembered only that Mr. Thompson was, in fact, moved on that date.

Liberty's disciplinary records indicate that in the early morning of March 16, 2014, Mr. Thompson was making a disturbance in his cell, "curs[ing] [at] staff and yell[ing] down the" confinement block. The records recount that Officer Goff spoke with Mr. Thompson to calm him down but was unsuccessful. Officer Goff therefore notified Sergeant Jeremy Strength, the other confinement officer on duty that morning, of Mr. Thompson's behavior. Sergeant Strength then attempted to counsel Mr. Thompson. However, Mr. Thompson did not cease acting disruptively, "continu[ing] to yell down the [confinement] wing and curse staff."

Because of Mr. Thompson's behavior, Sergeant Strength called Captain Sikes. With Sergeant Strength in tow, Captain Sikes went to counsel Mr. Thompson. Captain Sikes testified at trial that Mr. Thompson was not screaming or yelling when he approached Thompson's cell. After the two exchanged words, Captain Sikes walked away, then Mr. Thompson began "screaming out of the cell at [him]." Captain Sikes returned to speak with Mr. Thompson but left after a few moments to attend to his "other duties on the compound." Some time later, Sergeant Strength called Captain Sikes to report that Mr. Thompson "continued his disorderly behavior."

Captain Sikes then checked Mr. Thompson's medical records from his pre-confinement physical to determine whether it was safe to pepper spray him. Captain Sikes confirmed that it was. After receiving authorization from the duty warden to pepper spray Mr. Thompson, Captain Sikes called Officer Hoffman to record the interaction. As shown on the video recording, Captain Sikes and Officer Hoffman returned to Mr. Thompson's cell. Captain Sikes gave Mr. Thompson a final "cease and desist" order and, after Thompson and Captain Sikes's heated discussion ensued, Captain Sikes instructed Officer Hoffman to turn off the camera. Captain Sikes and Officer Hoffman then left Mr. Thompson's cell area. Captain Sikes testified at trial that he returned with Officer Goff, instead of Officer

8

Hoffman, because Officer Goff was trained in administering chemical agents. Officer Goff did not record the actual spraying of Mr. Thompson.

Per Captain Sikes's command, Officer Goff pepper sprayed Mr. Thompson. According to Captain Sikes, "it had little effect" and Mr. Thompson continued to "yell[] and scream[]."  As a result, Captain Sikes directed Officer Goff to pepper spray Mr. Thompson another time and, after the second spraying, Thompson "became compliant."  Captain Sikes took Mr. Thompson to the shower, then to the medical unit for a checkup, and finally back to his cell.  During that time, Officer Goff cleaned the chemical agents from Mr. Thompson's cell.  And at trial, Officer Goff testified that the residue left on the wall in Mr. Thompson's cell was merely a dye stain.

In August 2014, Mr. Thompson filed a pro se 42 U.S.C. § 1983 lawsuit against Captain Sikes and Officer Price, alleging that they retaliated against him for filing grievances against prison personnel.  Mr. Thompson also claimed the two violated his First Amendment rights by confiscating his legal papers.[2]  Later, in May 2015, Mr. Thompson filed a second pro se § 1983 lawsuit.  This time, he listed Captain Sikes and Officer Goff as defendants.  In his second lawsuit, Mr.

---

[2] Mr. Thompson sued several other prison guards, but his claims against them are not at issue in this appeal.  As a result, we discuss only Mr. Thompson's claims against Captain Sikes, Officer Price, and Officer Goff.

9

Thompson alleged Captain Sikes and Officer Goff violated his Eighth Amendment rights by unlawfully retaliating against him and pepper spraying him.  In March 2016, Mr. Thompson amended his first lawsuit to include a claim that Captain Sikes and Officer Goff violated his Eighth Amendment rights by pepper spraying him.  As a result, both complaints contained roughly the same allegations—that Captain Sikes, Officer Price, and Officer Goff violated Mr. Thompson's rights under the First and Eighth Amendments by retaliating against him for filing grievances and pepper spraying him without justification.  The cases initially proceeded separately before two different District Court judges.

On June 19, 2017, Captain Sikes and Officer Price moved for summary judgment in Mr. Thompson's first lawsuit.  They argued Mr. Thompson could not recover compensatory and punitive damages under the PLRA because Mr. Thompson had not "suffered a greater than de minimis [physical injury]" by being pepper sprayed.  Before ruling on Captain Sikes and Officer Price's motion for summary judgment, the District Court consolidated Mr. Thompson's two lawsuits.

At this point, however, Captain Sikes and Officer Goff had also filed a motion for summary judgment in the second case making a similar de minimis injury argument.  A magistrate judge in the second case issued a report and recommendation ("R&R") agreeing with the officers and recommended that the District Court find that Mr. Thompson could not recover compensatory or punitive

10

damages because he had not suffered a "physical injury" within the meaning of the PLRA.  Mr. Thompson, still proceeding pro se, did not file an objection, and the District Court entered an order adopting the R&R and limiting Mr. Thompson's claims to nominal damages in the second case.

Returning to the officers' motion for summary judgment in the first case, we note the District Court directed the Clerk to invite members of the Northern District of Florida bar to represent Mr. Thompson pro bono.  Two attorneys[3] volunteered and, on behalf of Mr. Thompson, filed a response to Captain Sikes and Officer Price's motion for summary judgment.  In that response, Mr. Thompson argued that the facts supported a claim for compensatory and punitive damages because he suffered more than a de minimis physical injury as a result of the officers' use of pepper spray on him.  Mr. Thompson also argued that the District Court was not bound by the earlier summary judgment ruling in the second case, which was made prior to the consolidation of the cases by a different judge and while Mr. Thompson was without counsel.

After hearing argument on Captain Sikes and Officer Price's motion, the District Court granted Captain Sikes, Officer Price, and Officer Goff summary judgment in a pretrial order, stating that "[s]ummary judgment is granted on all

---

[3] Chad Dunn volunteered to represent Mr. Thompson, and his law partner, K. Scott Brazil, joined him at trial.

claims for compensatory or punitive damages; the case will go forward on the nominal-damages claims against [] Sikes, [] Price . . . , and Goff." Mr. Thompson then proceeded to trial on his First and Eighth Amendment claims for nominal damages.

The jury returned a verdict in favor of Mr. Thompson on both claims. The jury found, among other things, that: (1) Mr. Thompson's legal papers were taken in retaliation "for his filing of grievances" and that Officer Price either participated in the taking of the papers or was in a position to stop the taking of the papers and failed to do so; (2) Thompson "[w]as . . . unlawfully sprayed with chemical agents"; and (3) both Captain Sikes and Officer Goff were "responsible for the unlawful spraying." The jury awarded Mr. Thompson $10, the maximum amount of nominal damages permitted under the District Court's jury instructions.

Mr. Thompson then moved the District Court for injunctive relief to require Captain Sikes, Officer Price, and Officer Goff to: (1) refrain from taking action against him in retaliation for the jury's verdict; (2) refrain from confiscating his legal files; (3) make a reasonable effort to locate his previously confiscated legal files; and (4) refrain from spraying or using force against him without justification. Mr. Thompson also moved for a new trial, arguing, among other things, that the District Court erred in failing to submit his claims for compensatory and punitive damages to the jury.

12

The District Court denied Mr. Thompson's request for injunctive relief.  The District Court did so because Mr. Thompson never previously demanded injunctive relief and Captain Sikes, Officer Price, and Officer Goff "would have had a colorable defense" against Thompson's injunction if he requested it earlier.[4]  The District Court also denied Mr. Thompson's motion for a new trial, stating that "[a]n unbroken line of decisions of district courts in [the Eleventh Circuit] holds that [pepper] spraying that causes temporary pain but has no lasting effects does not constitute 'physical injury' within the meaning" of the PLRA.  The District Court concluded that because Mr. Thompson could not show more than a de minimis injury from being pepper sprayed he could not recover compensatory or punitive damages.

Mr. Thompson also asked the District Court to determine the award of attorney's fees and expenses, arguing that because he prevailed at trial, he was entitled to reasonable attorney's fees under 42 U.S.C. § 1988.  The District Court agreed that Mr. Thompson prevailed at trial and was entitled to fees but concluded that the PLRA (a) requires a district court to award the first 25% of a prisoner's judgment toward the payment of attorney's fees; and (b) caps a total attorney's fee award at 150% of the judgment.  The District Court therefore awarded $15 in

---

[4]  The District Court noted that prior to trial, Mr. Thompson was moved out of Liberty and no longer had any dealings with the defendants.

13

attorney's fees, $12.50 of which was to be paid for by Captain Sikes, Officer Price, and Officer Goff, and the remaining $2.50 from Mr. Thompson's $10 nominal damages judgment.  This is Mr. Thompson's appeal.

## II.  STANDARDS OF REVIEW

This Court reviews <u>de novo</u> a District Court's grant of summary judgment, considering all evidence in the light most favorable to the non-moving party. <u>Melton v. Abston</u>, 841 F.3d 1207, 1219 (11th Cir. 2016) (per curiam).  We affirm the grant of summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 2552 (1986).

The interpretation of a federal statute is a question of law that we also review <u>de novo</u>.  <u>Truesdell v. Thomas,</u> 889 F.3d 719, 723 (11th Cir. 2018).  We review the District Court's determination to award expenses for an abuse of discretion.  <u>Dowdell v. City of Apopka</u>, 698 F.2d 1181, 1187 (11th Cir. 1983).  Although we review the grant or denial of an injunction for an abuse of discretion, we review <u>de novo</u> the underlying legal issues related to an injunction.  <u>Common Cause/Georgia v. Billups</u>, 554 F.3d 1340, 1349 (11th Cir. 2009).

## III.  DISCUSSION

Mr. Thompson's appeal concerns the District Court's construction of 42 U.S.C. §§ 1997e(e) and 1997e(d)(2)—two subsections of the PLRA.  As relevant here, subsection 1997e(e) bars prisoners from recovering damages for mental or emotional injuries sustained while incarcerated except for instances where the prisoner suffers a "physical injury."  42 U.S.C. § 1997e(e).  Subsection 1997e(d)(2) limits the award of attorney's fees to be paid by the defendant in the event that the prisoner-plaintiff prevails in his lawsuit.  Id. § 1997e(d)(2).

First, Mr. Thompson argues that the harm he suffered as a result of being pepper sprayed constitutes a physical injury within the meaning of § 1997e(e).  Because the text of § 1997e(e) contains no requirement for a lasting physical injury, Mr. Thompson says temporary injuries, like the effects of being pepper sprayed, suffice.  Second, Mr. Thompson contends § 1997e(d)(2)'s cap on attorney's fees does not apply if the District Court's calculation of a "reasonable" attorney's fee award exceeds 150% of the judgment.  Last, Mr. Thompson argues § 1997e(d)(2)'s cap does not apply to the award of expenses.  We address each argument in turn.[5]

---

[5] The officers argue Mr. Thompson waived his appeal of the District Court's grant of summary judgment on the issue of compensatory and punitive damages.  We reject this argument.  Before the two cases were consolidated and counsel appointed, Mr. Thompson failed to object in the second case to a magistrate judge's recommendation that he did not suffer a "physical injury" within the meaning of § 1997e(e).  But once the District Court consolidated the two cases, Mr. Thompson's counsel filed a memorandum in opposition to Captain Sikes and

We begin with Mr. Thompson's arguments about § 1997e(e).  Titled "Limitation on recovery," § 1997e(e) provides, in relevant part, that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."  42 U.S.C. § 1997e(e).  Subsection 1997e(e) does not limit a prisoner's ability to bring constitutional claims in the absence of a physical injury; it instead limits the damages that may be awarded in those circumstances.  Under the statute, for Mr. Thompson to be entitled to compensatory or punitive damages, he must show that he suffered a "physical injury."  Subsection 1997e(e) does not define what constitutes a "physical injury," see id., but this Court has determined the required "physical injury" must be more than "de minimis," although it "need not be significant."  Harris v. Garner ("Harris I"), 190 F.3d 1279, 1286 (11th Cir.), reh'g en banc granted, vacated, 197 F.3d 1059 (11th Cir. 1999), and reinstated in relevant part on reh'g , 216 F.3d 970 (11th Cir. 2000) (en banc) ("Harris II");  see also Mitchell v. Brown & Williamson Tobacco Corp., 294 F.3d 1309, 1312–13 (11th Cir. 2002).

---

Officer Goff's motion for summary judgment.  In that motion, Mr. Thompson addressed arguments as to all three defendants—Captain Sikes, Officer Price, and Officer Goff.  And, when the District Court ruled on that motion, it specifically stated "the case will go forward on the nominal-damages claims against [] Sikes, [] Price . . . , and Goff."  Because the District Court therefore issued a new summary judgment decision as to all three defendants once the cases were consolidated, Mr. Thompson did not waive his challenge of the District Court's compensatory and punitive damages ruling on appeal.

This Court crafted the de minimis standard by "fusing [together] the physical injury analysis under section 1997e(e) with the framework set out by the Supreme Court in [Hudson v. McMillian, 503 U.S. 1, 112 S. Ct. 995 (1992)] for analyzing claims brought under the Eighth Amendment for cruel and unusual punishment." Harris I, 190 F.3d at 1286.  Given the PLRA's "essential purpose" to curtail "frivolous and abusive prisoner litigation" about the "routine discomfort[s]" of confinement, we looked to Hudson for guidance on what sorts of injuries fall within those bounds.  Id. (quotation marks omitted).  Hudson, for its part, held that "routine discomforts" and other de minimis uses of physical force do not trigger the "Eighth Amendment's prohibition on cruel and unusual punishments."[6]  503 U.S. at 9–10, 112 S. Ct. at 1000 (quotation marks omitted).  In light of this overlap between the PLRA's purpose and the Supreme Court's analysis in Hudson, this Court adopted the de minimis standard and concluded that our "well established Eighth Amendment standards . . . guide us in our section 1997e(e) analysis." Harris I, 190 F.3d at 1287.

The parties do not dispute that the de minimis standard applies.  Instead, they disagree about whether pepper spraying can cause a "greater than de minimis"

---

[6] Nevertheless, the Supreme Court recognized that even a de minimis use of physical force could be sufficient for Eighth Amendment purposes if the use of force is the type that is "repugnant to the conscience of mankind." Hudson, 503 U.S. at 9–10, 112 S. Ct. at 1000 (quotation marks omitted).

physical injury.  Like the District Court, the officers say § 1997e(e)'s physical injury requirement bars prisoners from recovering compensatory or punitive damages for injuries suffered from pepper spraying under this Court's "greater than de minimis" standard.[7]  Mr. Thompson argues it does not and that his pepper spraying injury, in particular, led to greater than de minimis physical injury.

First, we conclude § 1997e(e) does not categorically bar prisoners from recovering compensatory or punitive damages for temporary (but greater than de minimis) injuries resulting from the unlawful use of pepper spray against them. We then address whether, in the context of a summary judgment motion, Mr. Thompson's alleged injury—being pepper sprayed and made to sit with the chemical agents on him for nearly twenty minutes, forced to take an extended shower to allow the chemicals to run into sensitive crevices of his body, and returned to a cell contaminated with pepper spray for the rest of that day and part of the following day—amounts to a greater than de minimis physical injury.  We conclude that a reasonable jury could find that it does.  We therefore reverse the District Court's grant of summary judgment in favor of Captain Sikes, Officer

---

[7] At oral argument, the officers conceded that § 1997e(e) does not bar recovery of compensatory or punitive damages for all instances of pepper spraying. Oral Arg. at 17:48–58 ("It is not the appellee's position today that a spraying with chemical agents under any circumstances is necessarily de minimis.").  And they also conceded that they were no longer relying on the permanent/non-permanent distinction they cited in their brief to the Court. Id. at 18:32–37.  But because the District Court relied on this distinction and the officers argued it in their response brief, we address it on appeal.

Price, and Officer Goff and remand this case to the District Court for further proceedings.

1. <u>Subsection 1997e(e) does not categorically bar prisoners from recovering compensatory or punitive damages for a temporary injury resulting from unlawful pepper spraying</u>

We begin with Mr. Thompson's argument that § 1997e(e) does not automatically bar compensatory or punitive damages for injuries, like pepper spraying, which normally leave "no lasting effect[]." This Court has yet to articulate boundaries for the <u>de minimis</u> standard we established in <u>Harris I</u>. <u>See, e.g.</u>, <u>Brooks v. Warden</u>, 800 F.3d 1295, 1307–08 (11th Cir. 2015) ("In this case, [the plaintiff] did not allege any physical injury arising from his hospital stay."); <u>Al-Amin v. Smith</u>, 637 F.3d 1192, 1196 (11th Cir. 2011) ("[The plaintiff's] complaint does not allege a physical injury"); <u>Boxer X v. Harris</u>, 437 F.3d 1107, 1110 n.2 (11th Cir. 2006) (declining to address the physical injury requirement because the defendant did not raise the issue below). We therefore follow <u>Harris I</u>'s lead and look to our Eighth Amendment jurisprudence to guide our analysis. <u>See</u> 190 F.3d at 1286–87 (relying on <u>Shabazz v. Barnauskas</u>, 790 F.2d 1536, 1538 (11th Cir. 1986) (per curiam), an Eighth Amendment case, to conclude that a forced dry shave, "without more, is simply not the kind of 'injury' that is cognizable under [sub]section 1997e(e)").

19

Eighth Amendment precedent from this circuit allows a plaintiff to recover for the unlawful use of pepper spray. In Thomas v. Bryant, 614 F.3d 1288 (11th Cir. 2010), this Court considered whether a prison's non-spontaneous use-of-force policy relating to the use of chemical agents violated the Eighth Amendment. Id. at 1293–94, 1296–97. As a "disciplinary tool," the policy allowed for "corrections officers [to] administer chemical agents . . . into the cell of a recalcitrant inmate in order to force the inmate to comply with the officer's orders and to quell [an] underlying disturbance." Id. at 1296–97. The plaintiff, who was mentally ill, had been subjected to the policy and sprayed with chemical agents thirty-six times between 2001 and 2007. Id. at 1299.

This Court affirmed the District Court's declaratory judgment against the defendants. Id. at 1317. In deciding to affirm, the panel explained that although "it is well-established that the use of chemical agents on recalcitrant prisoners is not per se unconstitutional, . . . there are constitutional boundaries to its use." Id. at 1310 (citations omitted). We said "where chemical agents are used unnecessarily, without penological justification, or for the very purpose of punishment or harm, that use" may be the basis of an Eighth Amendment claim.[8]

---

[8] In Thomas, we held that the prison's non-spontaneous use-of-force policy was "unnecessary" and "without penological justification" in the plaintiff's particular case, in part because his mental illness rendered him "unable to understand and comply with the [correctional] officers' orders." Thomas, 614 F.3d at 1310–12.

Id. at 1311; see also Danley v. Allen, 540 F.3d 1298, 1309 (11th Cir. 2008) (holding that unnecessary and continued exposure to pepper spray after the initial spraying due to lack of decontamination may form the basis of an Eighth Amendment claim), overruled on other grounds as recognized by Randall v. Scott, 610 F.3d 701, 709 (11th Cir. 2010).  Under our case law, then, a plaintiff may assert an Eighth Amendment violation on the basis that he was unlawfully pepper sprayed.

This Court has also allowed a plaintiff to assert an Eighth Amendment claim even when he suffered only temporary, non-substantial injuries from being pepper sprayed and subsequently confined to a poorly ventilated cell for twenty minutes before being allowed to shower.  See Danley, 540 F.3d at 1308–09 (finding an Eighth Amendment violation from a pepper spraying incident although "[a]ny injuries or discomfort Danley suffered . . . were neither substantial nor long lasting" (emphasis added)); see also Williams v. Benjamin, 77 F.3d 756, 764, 768 (4th Cir. 1996) (reversing the grant of summary judgment on an Eighth Amendment claim although the plaintiff "did not suffer any documented medical injury" as a result of being sprayed with chemical agents and confined in four-point restraints for eight hours because it was possible the "amount of mace used could . . . have caused immense pain").  And the Supreme Court has signaled that a significant and permanent injury is not required to support an excessive force claim

under the Eighth Amendment.  See Wilkins v. Gaddy, 559 U.S. 34, 38, 130 S. Ct. 1175, 1178–79 (2010) (per curiam) ("An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury."); see also Hudson, 503 U.S. at 9, 112 S. Ct. at 1000 (explaining that there can be an Eighth Amendment violation "whether or not significant injury is evident" because "[o]therwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury.").

We therefore conclude that just as an unlawful spraying of chemical agents can lead to an Eighth Amendment violation, it may also give rise to a "greater than de minimis" physical injury.  See Harris I, 190 F.3d at 1286–87; Thomas, 614 F.3d at 1312.  We recognize that in most circumstances, pepper spraying is "designed to disable a [prisoner] without causing permanent physical injury," Vinyard v. Wilson, 311 F.3d 1340, 1348 (11th Cir. 2002) (quotation marks omitted), but that fact does not exclude it from Eighth Amendment scrutiny, see Danley, 540 F.3d at 1308–09.  Neither should it automatically preclude pepper spraying from counting as a physical injury under § 1997e(e).  For this reason, this Court's "greater than de minimis" requirement does not categorically bar compensatory or punitive damages for temporary injuries arising from an unlawful pepper spraying.  A

22

prisoner-plaintiff may very well prevail under the de minimis threshold without asserting a permanent, long-lasting physical injury.

But this conclusion does not end our analysis. Certainly not every use of pepper spray, as a matter of law, gives rise to a "greater than de minimis" physical injury. Cf. Soto v. Dickey, 744 F.2d 1260, 1270 (7th Cir. 1984) ("The Supreme Court has never held, nor have we or any other court of appeals, so far as we can determine, that the use of tear gas or a chemical agent is a per se violation of the Eighth Amendment."); Hudson, 503 U.S. at 8, 112 S. Ct. at 1000 ("What is necessary to show sufficient harm for purposes of the Cruel and Unusual Punishments Clause depends upon the claim at issue."). But it is also true that § 1997e(e) does not, as a matter of law, preclude compensatory or punitive damages for all pepper-spraying incidents. And in the same way § 1997e(e) does not categorically bar compensatory or punitive damages for pepper spraying, nor does it categorically require damages for the same. We must therefore decide whether Mr. Thompson's pepper-spraying injury, as alleged, exceeds the de minimis threshold for purposes of defeating the summary judgment motion filed by the officers.

2. A reasonable jury could find that Mr. Thompson's injury exceeds the *de minimis* threshold

Our survey of this Court's precedent, as well as our sister circuits', reveals no consensus for how to determine when a physical injury is "greater than de

23

minimis." We recognize that the PLRA was designed to curtail frivolous prisoner litigation. See Harris II, 216 F.3d at 977. Yet it was not intended to allow only those prisoner-plaintiffs with severe physical injuries to recover compensatory or punitive damages. See id. And our circuit's Eighth Amendment case law allows a prisoner to recover for greater than de minimis physical injury even if it falls short of requiring professional medical attention. See Danley, 540 F.3d at 1308–09.

The decisions of our sister circuits identify a spectrum of injuries alleged by prisoners, ranging from trivial to serious. The injuries on this spectrum that do not meet the de minimis threshold include nausea and vomiting from the smell of raw sewage covering the floor of an isolation cell, Alexander v. Tippah County, 351 F.3d 626, 631 (5th Cir. 2003) (per curiam), and a forced dry shave causing "bleeding, inflammation, irritation, ingrowing of hairs, infection, purulence and pain," Harris I, 190 F.3d at 1287 (quotation marks omitted). These injuries, like the "push or shove" described by the Supreme Court in Hudson, 503 U.S. at 9, 112 S. Ct. at 1000 (quotation marks omitted), attest to a routine discomfort associated with confinement.

The other end of this spectrum is made up of injuries far more severe and, in many cases, life-altering. See, e.g., McAdoo v. Martin, 899 F.3d 521, 525 (8th Cir. 2018) (holding that fractured shoulder, which required surgery and caused "some amount of permanent disability" was greater than de minimis physical injury);

24

Irving v. Dormire, 519 F.3d 441, 448 (8th Cir. 2008) (finding a punch resulting in loosened teeth and two months of breathing difficulties was greater than de minimis physical injury within the meaning of § 1997e(e)).  These injuries cannot be chalked up to routine discomforts of confinement.  See Wilkins, 559 U.S. at 37, 130 S. Ct. at 1178 (noting that "contemporary standards of decency always are violated" when officials act "maliciously and sadistically . . . to cause harm" (quotation marks omitted)).

While we do not set forth a specific test to determine whether injuries from pepper spraying are more than de minimis, the foregoing examples demonstrate those types of injuries falling on either side of the de minimis injury threshold.  We also reiterate that "routine discomforts" associated with confinement do not cross this threshold.  Of course, spraying done sadistically, with no penological justification, does not constitute a "routine discomfort" associated with confinement.

Viewing the evidence in the light most favorable to Mr. Thompson, see Sears v. Roberts, 922 F.3d 1199, 1205 (11th Cir. 2019), we now turn to Mr. Thompson's alleged injury.  See e.g. Lawrence v. Bowersox, 297 F.3d 727, 731 (8th Cir. 2002) (in an incident involving pepper spray, a case-specific inquiry should take place "consider[ing] the extent of the pain inflicted in order to determine whether a constitutional deprivation has occurred").  Mr. Thompson

25

says he was pepper sprayed and left with the chemical agents on his face for approximately twenty minutes; experienced coughing, difficulty breathing, and a prolonged burning sensation; was forced to take an extended shower to exacerbate the effects of the pepper spray; and was returned to a cell that remained contaminated with pepper-spray residue.  Mr. Thompson says he continued to suffer for at least an additional day until another inmate used his shirt to try to clean the pepper-spray residue from the wall of the cell.

These allegations, combined with the well-known fact that "[p]epper spray is designed to disable . . . by causing intense pain, a burning sensation that causes mucus to come out of the nose, an involuntary closing of the eyes, a gagging reflex, and temporary paralysis of the larynx," Danley, 540 F.3d at 1309 (quotation marks omitted), could reasonably be construed as more akin to the type of injuries our sister circuits have characterized as greater than de minimis.  And, as we have recognized, being pepper sprayed sadistically and without penological justification is not a routine discomfort of confinement.  See Thomas, 614 F.3d at 1308–11; Danley, 540 F.3d at 1308 ("[S]ubjecting a prisoner to special confinement that causes him to suffer increased effects of environmental conditions—here, the pepper spray lingering in the air and on him—can constitute excessive force.").  Nor is it so frivolous as to frustrate the purpose of the PLRA.  See Harris I, 190 F.3d at 1286.

26

We therefore reverse the District Court's grant of summary judgment to Captain Sikes, Officer Price, and Officer Goff and vacate the jury's award of nominal damages.  On remand, the District Court should conduct a new trial on the issue of whether Mr. Thompson suffered greater than a de minimis physical injury when he was pepper sprayed, as well as the issue of his damages.

## IV.  CONCLUSION

We reverse the District Court's grant of summary judgment to Captain Sikes, Officer Price, and Officer Goff, and remand for a new trial on whether Mr. Thompson suffered a greater than de minimis physical injury, as well as his damages.[9]  By remanding for a new trial on these two issues, we do not disturb the jury verdict finding defendants liable for retaliation and unlawful pepper spraying.

---

[9] As we have noted, Mr. Thompson also appeals the District Court's denial of his motion for injunctive relief.  We need not reach that issue because we reverse the District Court's grant of summary judgment.  If Mr. Thompson still seeks injunctive relief, he should request that relief upon remand so that Captain Sikes, Officer Price, and Officer Goff will have the opportunity to defend against it.  See Fed. R. Civ. P. 54(c); Int'l Harvester Credit Corp. v. East Coast Truck, 547 F.2d 888, 891 (5th Cir. 1977).

PER CURIAM:

We now turn to Mr. Thompson's arguments regarding the computation of his attorney's fee award.[1]  Mr. Thompson argues the District Court erred in calculating the attorney's fee award under the PLRA and limiting his fees to $15—150% of his nominal damages award of $10.  He contends if a reasonable attorney's fee is greater than 150% of the judgment, then the limitation on attorney's fees imposed by Section 1997e(d)(2) of the PLRA does not apply.  He also says the PLRA's cap on attorney's fees does not apply to the award of expenses.  We address Mr. Thompson's arguments in turn, holding that § 1997e(d)(2) caps the attorney's fee award at 150% of the judgment, and the cap includes expenses.

1.  Subsection § 1997e(d)(2)'s Cap on Attorney's Fees

"In the United States, the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser."  Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 247, 95 S. Ct. 1612, 1616 (1975).  However, Congress can alter this presumption by statute and define both the circumstances

---

[1] We address Mr. Thompson's attorney's fee award arguments because he may face the same issues if he prevails at his second trial.  Our precedent permits this in the interest of judicial economy.  See Williamson v. Tucker, 645 F.2d 404, 416–17 (5th Cir. 1981); see also Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981).

28

under which attorney's fees can be shifted and the district court's discretion to do so.  See id. at 254–57, 261–62, 95 S. Ct. at 1620–21, 1624.  Congress did so when it granted district courts discretion to award reasonable attorney's fees to prevailing civil-rights litigants under 42 U.S.C. § 1988(b).  And Congress likewise allowed for an award of attorney's fees in certain situations where the plaintiff is a prisoner bringing a civil-rights claim.

But Congress also imposed limitations on those attorney's fees awards when it enacted the PLRA.  Specifically, subsection § 1997e(d)(2) limits the fees that a district court can award to prisoners' lawyers in civil cases under § 1988(b).  See Murphy v. Smith, ___ U.S. ___, 138 S. Ct. 784, 789 (2018) (noting the PLRA "expressly qualifies the usual operation of § 1988(b) in prisoner cases" and that Section 1997e(d) limits the "district court's pre-existing discretion under § 1988(b)");  see also Shepherd v. Goord, 662 F.3d 603, 606 (2d Cir. 2011) ("With the 1996 enactment of the PLRA, Congress imposed substantial restrictions on § 1988(b) attorney's fee awards to prevailing prisoner-plaintiffs." (quotation marks omitted)).  Relevant here, the PLRA limits the recovery of attorney's fees in § 1983 cases as follows:

> Whenever a monetary judgment is awarded in [favor of a prisoner who is entitled to recover fees under 42 U.S.C. § 1988], a portion of the judgment (not to exceed 25 percent) shall be applied to satisfy the amount of attorney's fees awarded against the defendant.  If the award of attorney's fees is not greater than 150 percent of the judgment, the excess shall be paid by the defendant.

29

42 U.S.C. § 1997e(d)(2).  The Supreme Court has interpreted this provision to require a district court to award the first 25% of a prisoner's judgment towards the payment of his attorney's fees.  Murphy, 138 S. Ct. at 787–88.  Mr. Thompson does not contest this point.  Instead, he argues the PLRA does not cap an attorney's fee award in the event the reasonable attorney's fee is greater than 150% of the judgment.  We disagree and join all of our sister courts who have addressed this issue.

We begin our analysis of § 1997e(d)(2) by looking at the language of the statute itself.  See United States v. Mandhai, 375 F.3d 1243, 1247 (11th Cir. 2004).  "If the statute's meaning is plain and unambiguous, there is no need for further inquiry."  United States v. Fisher, 289 F.3d 1329, 1338 (11th Cir. 2002); see also Harris II, 216 F.3d at 976 ("When the import of the words Congress has used is clear, as it is here, we need not resort to legislative history, and we certainly should not do so to undermine the plain meaning of the statutory language.").  Courts presume that a legislature says in a statute what it means and means what it says.  Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992).  But if a statute's text is ambiguous, we may look to legislative history "for additional guidance as to Congress's intent."  United States v. Zuniga-Arteaga, 681 F.3d 1220, 1223 (11th Cir. 2012).

Subsection 1997e(d)(2) is not ambiguous when it comes to the attorney's fee cap. The last sentence of § 1997e(d)(2) affirmatively states that "[i]f the award of attorney's fees is not greater than 150 percent of the judgment, the excess shall be paid by the defendant." 42 U.S.C. § 1997e(d)(2). By its terms, the statute unambiguously permits imposing liability for an award of attorney's fees on defendants only for a total fee amount that does not exceed 150% of the judgment, with the first 25% of the fee amount to be furnished  from the plaintiff's judgment.

Mr. Thompson, though, contends that the statutory language means Captain Sikes, Officer Price, and Officer Goff are liable for the full amount of a reasonable attorney's fee award up until 150% of the monetary judgment. But once a reasonable fee exceeds 150% of the monetary judgment Mr. Thompson argues § 1997e(d)(2) no longer applies, and the District Court may award reasonable fees under § 1988(b) without restriction.

Mr. Thompson's argument misses the mark. Under Mr. Thompson's interpretation, the defendants are always liable for the entirety—except for an amount equal to the first 25% of  the judgment—of a prisoner-plaintiff's reasonable attorney's fee award. He says that if the reasonable attorney's fee is less than 150% of the monetary judgment, the defendant is liable for the full amount. And if the reasonable fee is greater than 150% of the monetary judgment, the defendant is still liable for the full amount. So according to Mr. Thompson, the

31

defendant is always liable for attorney's fees, regardless of the amount. We reject Mr. Thompson's proposed construction of § 1997e(d)(2) because it would render the second sentence of the provision meaningless. See In re Walter Energy, Inc., 911 F.3d 1121, 1146 (11th Cir. 2018) ("[W]e generally construe a statute so that no clause, sentence, or word is rendered superfluous, void, or insignificant." (quotation marks omitted)); United States v. Fuentes-Rivera, 323 F.3d 869, 872 (11th Cir. 2003) (per curiam) ("[I]t is necessary to give meaning to all [a statute's] words so that no words shall be discarded as being meaningless, redundant, or mere surplusage." (quotation marks omitted)).

Our dissenting colleague also asserts our interpretation of the statutory text is incorrect. See Dissent at 46–47. She points to the word "if" in § 1997e(d)(2)'s statement that "if the award of attorney's fees is not greater than 150 percent of the judgment, the excess shall be paid by the defendant," and contends that our reading of the provision "renders the clause's use of the word 'if' meaningless." Id. at 47. It does so, in her view, because "[u]nder [our] interpretation, there is no 'event,' or second alternative, that may occur because the fee cap applies in all circumstances." Id. Put simply, Judge Martin contends that our interpretation "voids" the word "if" in § 1997e(d)(2).

We respectfully disagree. In fact, we think the word "if" in § 1997e(d)(2) mandates the statutory construction we adopt today. Section 1997e(d)(2) has two

32

sentences. The first provides, "Whenever a monetary judgment is awarded in [a qualifying action], a portion of the judgment (not to exceed 25 percent) shall be applied to satisfy the amount of attorney's fees awarded against the defendant." This sentence requires the district court in every case where a prisoner is awarded fees to direct the first 25% of the prisoner's judgment towards the payment of his attorney's fees. Murphy, 138 S. Ct. at 787–88. The second sentence of § 1997e(d)(2) provides, "If the award of attorney's fees is not greater than 150 percent of the judgment, the excess shall be paid by the defendant." To give meaning to this second sentence of § 1997e(d)(2)—including the word "if"—we must construe it to differentiate between two subsets of cases where a prisoner is awarded fees: those where the prisoner's total fees do not exceed 150 percent of the judgment, and those where they do.

In the subset of cases where the prisoner's total attorney's fees amount to 150 percent of the judgment or less, the defendant must pay anything above the first 25 percent of the amount of the judgment. But a different rule governs the subset of cases where the prisoner's total fees amount to more than 150 percent of the judgment: there, the fees in excess of 150 percent of the judgment are not paid by the defendant; they are paid by the prisoner. If this were not the case, the word "if" in the second sentence would have no meaning because the defendant's payment of the fees would not be contingent on anything; rather, the defendant

would always pay anything above the first 25 percent of the amount of the judgment, in every case where the plaintiff was awarded fees.

We agree with other courts that § 1997e(d)(2)'s language is awkwardly phrased and "inartful." Robbins v. Chronister, 435 F.3d 1238, 1240 (10th Cir. 2006). But we believe its meaning is clear. The statute explains that the excess— or remainder of attorney's fees after the prisoner's judgment satisfies an amount equal to 25% of the judgment—shall be paid by the defendant. 42 U.S.C. § 1997e(d)(2). But the award of attorney's fees cannot be "greater than 150 percent of the judgment." Id. We therefore join all of our sister circuits that have addressed this issue in holding that under § 1997e(d)(2), a defendant's liability for attorney's fees is capped at 150% of the judgment (less the amount contributed by the prisoner from his judgment).[2] See Boivin v. Black, 225 F.3d 36, 40 (1st Cir. 2000) (construing § 1997e(d)(2) to "impose[ ] a ceiling on the defendants' liability for attorneys' fees equal to 150% of the amount of [monetary] judgment"); Shepherd, 662 F.3d at 608 (2d Cir. 2011) ("§1997e(d)(2) caps the amount of attorney's fees that a prevailing prisoner-plaintiff may recover from a defendant at 150 percent of the monetary judgment awarded"); Parker v. Conway, 581 F.3d 198, 201 (3d Cir. 2009) (construing § 1997e(d)(2) to "limit[ ] a prevailing prisoner-

---

[2] Our holding today conforms with our previous acknowledgment of a "fee cap" in § 1997e(d)(2). See Jackson v. State Bd. of Pardons & Paroles, 331 F.3d 790, 798 (11th Cir. 2003).

34

plaintiff's attorney's fee award to 150 percent of the [monetary] judgment"); <u>Volk v. Gonzalez,</u> 262 F.3d 528, 536 (5th Cir. 2001) (holding that fees-on-fees were subject to § 1997e(d)(2)'s "limitation on the judgment debtors' responsibility for fees to 150 percent of the judgment"); <u>Walker v. Bain,</u> 257 F.3d 660, 667 (6th Cir. 2001) ("We believe that § 1997e(d)(2) must be read to limit defendants' liability for attorney fees to 150 percent of the money judgment"); <u>Johnson v. Daley,</u> 339 F.3d 582, 583 (7th Cir. 2003) (en banc) (rejecting equal-protection challenge to § 1997e(d) limitations on fee awards to prisoner-plaintiffs, including provision that "fees attributable to [monetary] relief cannot exceed 150% of the damages"); <u>Keup v. Hopkins,</u> 596 F.3d 899, 905 (8th Cir. 2010) (stating that circuit had "repeatedly construed" § 1997e(d)(2) "to cap awards of attorney fees in prisoner rights cases to 150% of the monetary damages awarded"); <u>Dannenberg v. Valadez,</u> 338 F.3d 1070, 1074–75 (9th Cir. 2003) (construing § 1997e(d)(2) to impose 150% fee cap); <u>Robbins,</u> 435 F.3d at 1244 (10th Cir. 2006) (<u>en banc</u>) (Section 1997e(d)(2)'s plain meaning, "limit[s] recovery of attorney fees from the defendant to 150% of the damage award").[3]

---

[3] We recognize that the language used by some of the courts is inexact. Defendants are not responsible to pay for the prisoner's attorney's fees in the amount of 150% of the judgment. Instead, a prisoner's attorney's fee award is capped at 150% of the judgment, with the prisoner paying an amount equal to the first 25% of the judgment and the defendant paying the remaining amount.

35

Our holding today is also in line with Supreme Court guidance. In Murphy, the Supreme Court expressly acknowledged that § 1997e(d) limits the district court's discretion to award fees under § 1988(b). Murphy, 138 S. Ct. at 789. And in a dissent, Justice Sotomayor recently suggested an interpretation of § 1997e(d)(2) identical to that that we set forth today. In Murphy, when discussing the bounds of Section 1997e(d)(2), Justice Sotomayor stated, **"if the prisoner-plaintiff was awarded damages, [the district court] may not award attorney's fees in excess of 150 percent of the monetary judgment."** Murphy, 138 S. Ct. at 796 (Sotomayor, J., dissenting). See also id. at 797 ("A district court likewise still has the discretion to determine what constitutes a reasonable amount of fees to award; it simply must abide by the two 150-percent caps in doing so.").[4] Nor does the fact

---

[4] As we have explained, we conclude that § 1997e(d)(2)'s language is plain and unambiguous, so we do not resort to the legislative history. Nevertheless, we note that the section's legislative history also favors our holding. As the Supreme Court noted in Murphy, Congress considered and rejected language prior to enacting the current attorney's fee apportionment provision. An earlier version of Section 1997e(d)(2) provided,

> Whenever a monetary judgment is awarded in an action described in paragraph (1), a portion of the judgment (not to exceed 25 percent) shall be applied to satisfy the amount of attorney's fees awarded against the defendant. If the award of attorney's fees is greater than 25 percent of the judgment, the excess shall be paid by the defendant.

Murphy, 138 S. Ct. at 790, n.2 (quoting Prison Litigation Reform Act of 1995, S. 1279, 104th Cong., 1st Sess., § 3(d), p. 16 (1995) (emphasis in original)). The rejection of the earlier language further bolsters the conclusion that the current version of the statute provides a 150% cap on fees. If, as Mr. Thompson suggests, no such cap existed, there would have been no need for Congress to reject the original language, since that language clearly provided that a defendant would pay any fees that were greater than 25% of the judgment. By rejecting this language and adopting the current version of the statute, Congress placed a limit on the amount of fees for which a defendant would be responsible.

36

that this case involves an award of only nominal damages alter the result.  The

150% fee cap applies regardless of the amount of damages awarded.  See, e.g.,

Boivin, 225 F.3d at 36; Shepherd, 662 F.3d at 607; Walker, 257 F.3d at 669;

Pearson v. Welborn, 471 F.3d 732, 742-44 (7th Cir. 2006); Keup, 596 F.3d at 905;

Robbins, 435 F.3d at 1239.

We now turn to the District Court's calculation of Mr. Thompson's

attorney's fee award.  The jury returned a verdict in Mr. Thompson's favor and

awarded him $10 in nominal damages.  Under § 1997e(d)(2), the District Court

awarded Mr. Thompson $15 in attorney's fees, with Captain Sikes, Officer Price,

and Officer Goff responsible for $12.50 and the remaining $2.50 to be taken from

Mr. Thompson's judgment.  The calculation required Mr. Thompson to pay an

amount equal to the first 25% of the judgment (i.e., $2.50) and the defendants to

pay the excess amount (i.e., $12.50), up to a total fee amount of 150% of the

judgment.  Because this calculation follows the requirements of § 1997e(d)(2), the

District Court did not err in its attorney's fee award.[5]

2.  Subsection § 1997e(d)(2)'s Cap Applies to Expenses

Mr. Thompson also claims that the District Court "erred in failing to award

[Mr. Thompson] . . . the reasonable expenses he incurred in litigating his case that

---

[5] Because we vacate the jury's award of nominal damages, we affirm only the District
Court's method of calculating attorney's fees under § 1997e(d)(2).  On remand, the District
Court should apply the same methodology to recalculate these fees if the judgment changes.

did not qualify as taxable court costs recoverable under 28 U.S.C. § 1920." Mr. Thompson argues that he incurred expenses, such as "court filing fee[s], jury consultant fees, copies, federal express and hotel/airline/parking charges," which should be recoverable from Captain Sikes, Officer Price, and Officer Goff.

As an initial matter, after reviewing the district court's order on attorney's fees, we note that it is not entirely clear whether the court included a consideration of expenses in its $15 award. We proceed, though, under the assumption that it did and found that expenses were also capped and part of the award.

As set out above, the shifting of attorney's fees in civil-rights disputes is governed by 42 U.S.C. § 1988. Section 1988 provides, in relevant part, that "the [district] court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b). This Court has held that expenses are considered a part of an attorney's fee award under § 1988. See Dowdell v. City of Apopka, 698 F.2d 1181, 1190 (11th Cir. 1983) ("Reasonable attorneys' fees under [§ 1988] must include reasonable expenses because attorneys' fees and expenses are inseparably intertwined as equally vital components of the costs of litigation."). And because the PLRA modifies the award of attorney's fees under § 1988, it must also modify the award of expenses under that same provision, in light of this Court's conclusion that reasonable attorney's fees under § 1988 include reasonable expenses. See id. The District

38

Court therefore did not err when it declined to award separate expenses to Mr.

Thompson outside of the attorney's fee award.[6]

## CONCLUSION

We affirm the methodology employed by the District Court to calculate

attorney's fees. If Mr. Thompson prevails at trial and recovers damages, the

District Court should employ the same method of calculation in determining his

attorney's fee award.

**REVERSED IN PART AND AFFIRMED IN PART.**

---

[6] The parties appear to have conflated costs and expenses. Taxable costs are those items listed in 28 U.S.C. § 1920(1)–(6). Expenses, which include travel costs, telephone, and postage expenses, fall within the purview of § 1988, see Dowdell, 698 F.2d at 1190–1192, and may be reimbursable in addition to costs under § 1920, see Sullivan Cty. v. Home Indem. Co., 925 F.2d 152, 153 (6th Cir. 1991) ("Congress expressed an unambiguous intent in 42 U.S.C. § 1988 to award attorney's fees 'as part of costs'; i.e., as an additional component of the traditional costs taxed by the court pursuant to 28 U.S.C. § 1920." (quotation marks omitted)). Here, because travel costs and postage are considered to be expenses, Mr. Thompson's attempt to recover for Federal Express costs and his attorneys' hotel, airline, and parking expenses are limited by the 150% cap as set forth in the PLRA. See Dowdell, 698 F.2d at 1190-92. In addition, the jury-consultant fees sought by Mr. Thompson are properly deemed an "expense" limited by the 150% cap and are also not recoverable under Section 1920 as a "cost." Rimini Street, Inc. v. Oracle USA, Inc., 139 S. Ct. 873, 878 (2019).

Finally, we note that Section 1920(1) allows for taxation of "fees of the clerk," and Section 1920(4) allows for "the costs of making copies of any materials where the copies are necessarily obtained for use in the case." Accordingly, on remand, Mr. Thompson could request reimbursement of his court filing fees and copies (assuming he could show such copies were necessarily obtained for use in his case).

MARTIN, Circuit Judge, dissenting:

The majority opinion holds that 42 U.S.C. § 1997e(d)(2) caps any award of attorney's fees in prisoner civil rights suits at 150% of the judgment. Maj. Op. at 28–39. My reading of § 1997e(d)(2) does not support this result. Subsection 1997e(d)(2) provides, in relevant part, that "[i]f the award of attorney's fees is <u>not greater than</u> 150 percent of the judgment, the excess shall be paid by the defendant." 42 U.S.C. § 1997e(d)(2) (emphasis added). The statute does not speak to what happens when the award of attorney's fees <u>is</u> greater than 150% of the judgment. Because the statute makes no provision for the treatment of attorney's fees awarded in an amount above 150%, the majority's ruling that caps attorney's fees at 150% of the judgment adds meaning to § 1997e(d)(2) that Congress never wrote. I therefore respectfully dissent from the majority's interpretation of § 1997e(d)(2). See <u>Nichols v. United States</u>, 578 U.S. __,  136 S. Ct. 1113, 1118 (2016) ("To supply omissions transcends the judicial function." (quotation marks omitted)).

## I.

Matthew Thompson filed his lawsuit <u>pro se</u>. His status as a <u>pro se</u> litigant is

40

no surprise, since the vast majority of prisoners file their civil rights lawsuits on their own in this Court.[1]  Without counsel, Mr. Thompson tried to navigate the timely filing of his complaint as well as respond to the officers' motion to dismiss and other deadlines on his own.  Mr. Thompson was then fortunate enough to have the District Court solicit members of the Northern District of Florida bar to represent him.  Likely due to his counsel's care and diligence—if not certainly—Mr. Thompson prevailed on his civil rights claim at trial.

After winning Mr. Thompson's trial, counsel sought attorney's fees and expenses as allowed by 42 U.S.C. § 1983 for a prevailing party in a civil rights case.  If Mr. Thompson were not incarcerated, his counsel would have been allowed to recover a reasonable attorney's fee award under 42 U.S.C. § 1988.  In fact, Congress passed § 1988 to encourage "the retention of independent counsel by victims of civil rights violations," Massengale v. Ray, 267 F.3d 1298, 1302 (11th Cir. 2001) (per curiam), in an effort to "ensure effective access to the judicial process for persons with civil rights grievances," Hensley v. Eckerhart, 461 U.S. 424, 429, 103 S. Ct. 1933, 1937 (1983) (quotation marks omitted).

---

[1] Between September 30, 2017 and September 30, 2018, approximately 94% of civil prisoner suits were filed pro se in the district courts of the Eleventh Circuit.  See Table C-13, U.S. District Courts–Civil Statistical Tables for the Federal Judiciary (Sept. 30, 2018), Admin. Office of the Courts, https://www.uscourts.gov/sites/default/files/data_tables/jb_c13_0930.2018.pdf.

But since Mr. Thompson is a prisoner, his lawsuit is governed by the Prison Litigation Reform Act ("PLRA").  The majority properly recognizes that the PLRA "limits the fees that a district court can award to prisoners' lawyers in civil cases under § 1988(b)."  Maj. Op. at 29.  Subsection 1997e(d)(2) does so in two ways.  First, § 1997e(d)(2) requires that up to 25% of the prisoner's judgment be used to satisfy the attorney's fee award.  42 U.S.C. § 1997e(d)(2); see Murphy v. Smith, ___ U.S. ___, 138 S. Ct. 784, 787–88 (2018).  Second, § 1997e(d)(2) says that "[i]f the award of attorney's fees is not greater than 150 percent of the judgment, the excess shall be paid by the defendant."  42 U.S.C. § 1997e(d)(2).

The majority construes § 1997e(d)(2)'s second limitation on attorney's fees as a 150% fee cap on all awards.  Maj. Op. at 31–32.  I write separately because that interpretation adds language to § 1997e(d)(2)'s text that does not exist, rendering a result not commanded by the statute.  The plain language of § 1997e(d)(2) imposes no such cap on attorney's fees recoverable in lawsuits governed by the PLRA.

## II.

The majority opinion concludes that § 1997e(d)(2) caps the award of attorney's fees at 150% of the judgment, because, per the majority, the plain text of the statute "unambiguously permits imposing liability for an award of attorney's fees on defendants only for a total fee amount that does not exceed 150% of the

42

judgment." Maj. Op. at 31. This idea, in turn, comes from § 1997e(d)(2)'s use of the phrase "'greater than 150 percent of the judgment.'" Id. at 34 (quoting 42 U.S.C. § 1997e(d)(2)). Relying on this language, the majority explains that "after the prisoner's judgment satisfies an amount equal to 25% of the judgment," the remainder "shall be paid by the defendant." Id. But, according to the majority, the remainder, or "excess," to be paid for by the defendant cannot be greater than 150 percent of the judgment. Id.

I reject to the majority's reading of the phrase "greater than 150 percent of the judgment" in isolation. First, proper statutory construction does not permit cherry-picking of certain phrases, clauses, or words in a statute. See Wachovia Bank, N.A. v. United States, 455 F.3d 1261, 1268 (11th Cir. 2006) (explaining that, when interpreting a statute, this Court cannot "read words or strings of [words] in isolation"). Second, this Court must interpret the plain language of a statute "in context," id., and give meaning "to every word and clause" in a statute's text to the extent possible. Bhd. of Locomotive Eng'rs & Trainmen Gen. Comm. of Adjustment CSX Transp. N. Lines v. CSX Transp., Inc., 522 F.3d 1190, 1195 (11th Cir. 2008).

The majority interprets the last sentence of § 1997e(d)(2), which provides that "[i]f the [fee] award . . . is not greater than 150 percent of the judgment, the excess shall be paid by the defendant," to mean that if the fee award is greater than

43

150% of the judgment, the defendant need not pay any excess fees. But this formulation of § 1997e(d)(2) incorporates a fallacy. Known as the "fallacy of the inverse," or denying the antecedent, the reconstruction of § 1997e(d)(2)'s meaning in the majority opinion is premised on "the incorrect assumption that if P implies Q, then not-P implies not-Q." NLRB v. Noel Canning, 573 U.S. 513, 589, 134 S. Ct. 2550, 2603 (2014) (Scalia, J., concurring); Ruggero K. Aldisert, Logic for Lawyers: A Guide to Clear Legal Thinking 158–63 (3d ed. 1997) (explaining that the denial of the antecedent, or "[t]he component proposition following 'if,'" does not warrant a denial of the consequent, or "[t]he component proposition following 'then'"). Using this approach, the majority opinion reads § 1997e(d)(2)'s text to mean its inverse. That is, the majority opinion construes, "If the award . . . is not greater than 150% of the judgment, then the excess shall be paid for by the defendant," 42 U.S.C. § 1997e(d)(2) (emphasis added), to mean that, "If the award is greater than 150% of the judgment, the excess shall not be paid for by the defendant."

Where, as here, the statutory language is plain, it is this Court's job to construe a statute as it is written. W. Va. Univ. Hosps., Inc. v. Casey, 499 U.S. 83, 98–99, 111 S. Ct. 1138, 1147 (1991). It is not our duty to enlarge or supplement a statute with language Congress omitted. Id. "The manner in which the law could have been written has no bearing; what matters is the law [Congress] did enact."

44

Shady Grove Orthopedic Assocs. v. Allstate Ins. Co., 559 U.S. 393 403, 130 S. Ct. 1431, 1440 (2010) (quotation marks and citations omitted); see also Trevan v. Office of Personnel Mgmt., 69 F.3d 520, 526 (Fed. Cir. 1995) ("[W]e must enforce the statute as written and are not free to ignore what appears to have been a conscious choice by Congress. . . ."). Subsection 1997e(d)(2) speaks only to what happens when the reasonable attorney's fee is "not greater than" 150% of the judgment. 42 U.S.C. § 1997e(d)(2). It is silent as to what happens when the award of attorney's fees is greater than 150% of the judgment. See id.

The statutory context also supports my reading of § 1997e(d)(2). Utility Air Regulatory Grp. v. EPA, 573 U.S. 302, 320, 134 S. Ct. 2427, 2441 (2014) ("[T]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme." (quotation marks omitted)). The provision immediately following § 1997e(d)(2) states: "No award of attorney's fees [recoverable in a prisoner civil suit] shall be based on an hourly rate greater than 150 percent of the hourly rate established under [the Criminal Justice Act] for payment of court-appointed counsel." 42 U.S.C. § 1997e(d)(3). If Congress intended to limit attorney's fees to 150% of the judgment in all circumstances, it would have done so explicitly and, presumably, with similar language. See Russello v. United States, 464 U.S. 16, 23, 104 S. Ct. 296, 300 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the

45

same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (citations omitted and alteration adopted)). Indeed, Congress could have simply said, "No award of attorney's fees shall exceed 150 percent of the judgment." But it did not. See id.; cf. Kurtz v. Comm'r, 575 F.3d 1275, 1280 (11th Cir. 2009) (noting that this Court "must presume that Congress said what it meant and meant what it said" (quotation marks omitted)).

Thus, while § 1997e(d)(2) sets out what happens if the award of attorney's fees is not greater than 150% of the judgment, the statute is silent as to awards that are greater than 150% of the judgment. Yet the majority opinion breathes meaning into § 1997e(d)(2)'s silence. That is something we—as judges—may not do. See Nichols, 136 S. Ct. at 1118. We are confined to the meaning of the plain text of § 1997e(d)(2), which by its terms imposes no absolute cap on the award of reasonable attorney's fees.

## III.

In support of its interpretation of § 1997e(d)(2), the majority opinion explains that the contrary interpretation would have bad consequences. It says that if § 1997e(d)(2) does not cap attorney's fees at 150% of the judgment, regardless of the reasonable attorney's fee award, the last sentence of § 1997e(d)(2) would be rendered meaningless. Maj. Op. at 31–31. But the interpretation given in the majority opinion also renders a portion of § 1997e(d)(2)'s text meaningless.

46

Again, § 1997e(d)(2) says "if the award of attorney's fees is not greater than 150 percent of the judgment, the excess shall be paid by the defendant." 42 U.S.C. § 1997e(d)(2) (emphasis added). The word "if" is a conditional word meaning "[i]n the event that" or "[o]n condition that," Webster's New College Dictionary 563 (3d ed. 2008), and can be used to "introduce[e] a clause of condition or supposition," Oxford English Dictionary (2d ed. 1989). Implicit, therefore, in § 1997e(d)(2) attorney's fee provision is a condition precedent to its applicability.

But the construction of § 1997e(d)(2) given in the majority opinion renders the clause's use of the word "if" meaningless. Under the majority's interpretation, there is no "event," or second alternative, that may occur because the fee cap applies in all circumstances. Our precedent requires us to reject an interpretation that voids a clause, sentence, or word. See In re Walter Energy, Inc., 911 F.3d 1121, 1146 (11th Cir. 2018) ("[W]e generally construe a statute so that no clause, sentence, or word is rendered superfluous, void, or insignificant." (quotation marks omitted)); United States v. Fuentes-Rivera, 323 F.3d 869, 872 (11th Cir. 2003) (per curiam) ("[I]t is necessary to give meaning to all [a statute's] words so that no words shall be discarded as being meaningless, redundant, or mere surplusage."

(quotation marks omitted)).[2]  For this reason, I cannot subscribe to the majority's holding.

## IV.

Last, the majority points to the decisions of our sister circuits holding that § 1997e(d)(2) caps attorney's fees at 150% of the judgment.  Maj. Op. at 34–35.  I recognize that my interpretation is not a widely accepted one.  But it is our job to review de novo the District Court's interpretation of § 1997e(d)(2).  See Truesdell v. Thomas, 889 F.3d 719, 723 (11th Cir. 2018).  And although our sister circuits (and a dissenting Justice) may coalesce around an interpretation of this statute that is different from mine, my view merely adheres to the straightforward text of the statute.  See Generali v. D'Amico, 766 F.2d 485, 489 (11th Cir. 1985).[3]

---

[2] The majority also points to § 1997e(d)(2)'s legislative history to support its position that § 1997e(d)(2) caps attorney's fees in all circumstances.  Maj. Op. at 36. n.13.  The majority says that § 1997e(d)(2)'s text is unambiguous, and we therefore need not resort to § 1997e(d)(2)'s legislative history to interpret its meaning.  Id.  But even if we did, the PLRA's stated purpose supports my conclusion.  Congress enacted the PLRA to curtail frivolous and abusive prisoner litigation.  See Harris v. Garner, 190 F.3d 1279, 1286 (11th Cir. 1999), reh'g en banc granted, vacated, 197 F.3d 1059 (11th Cir. 1999), reinstated in relevant part on reh'g by 216 F.3d 970 (11th Cir. 2000) (en banc).  It was not, however, intended to discourage attorneys from representing prisoners in civil rights cases.  See Woodford v. Ngo, 584 U.S. 81, 117, 126 S.Ct. 2378, 2401 (2006) (Breyer, J., concurring) (noting the PLRA was meant to "perserv[e] prisoners' capacity to file meritorious claims").  I fear the majority's construction of § 1997e(d)(2) will do just that.  Notably, the PLRA allows for prevailing prisoners to recover attorney's fees, see 42 U.S.C. § 1997e(d), indicating a congressional intent to ensure access to the judicial process for prisoners with civil rights claims.  See Hensley, 461 U.S. at 429, 103 S. Ct. at 1937.

[3] Justice Kagan has observed, "we're all textualists now."  Justice Elena Kagan, The Scalia Lecture: A Dialogue with Justice Kagan on the Reading of Statutes at 8:28 (Nov. 25, 2015), https://today.law.harvard.edu/in-scalia-lecture-kagan-discusses-statutory-interpretation/.

The plain and unambiguous text of § 1997e(d)(2) does not impose an absolute cap on the award of attorney's fees.  I therefore respectfully dissent from the majority's opinion holding to the contrary.